

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
01/21/2021

| | | |
|---|---|---|
| **IN RE:** | § | |
| **VANGUARD NATURAL RESOURCES,** | § | **CASE NO: 17-30560** |
| **LLC,** | § | |
| Debtor. | § | **CHAPTER 11** |
| | § | |

| | | |
|---|---|---|
| **VANGUARD OPERATING, LLC,** | § | |
| Plaintiff, | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 18-3244** |
| | § | |
| **SUBLETTE COUNTY TREASURER,** | § | |
| **WYOMING,** | § | |
| Defendant. | § | |
| | § | |

| | | |
|---|---|---|
| **VANGUARD OPERATING, LLC,** | § | |
| Plaintiff, | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 18-3245** |
| | § | |
| **NATRONA COUNTY TREASURER,** | § | |
| **WYOMING** | § | |
| Defendant. | § | |
| | § | |

| | | |
|---|---|---|
| **VANGUARD OPERATING, LLC,** | § | |
| Plaintiff, | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 18-3246** |
| | § | |
| **CAMPBELL COUNTY TREASURER** | § | |
| Defendant. | § | |
| | § | |

| | | |
|---|---|---|
| **VANGUARD OPERATING, LLC,** | § | |
| Plaintiff, | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 18-3247** |
| | § | |
| **JOHNSON COUNTY TREASURER,** | § | |
| **WYOMING** | § | |
| Defendant. | § | |
| | § | |

| | | |
|---|---|---|
| **VANGUARD OPERATING, LLC,** | § | |
| Plaintiff, | § | **ADVERSARY NO. 18-3248** |

| | § | |
|---|---|---|
| VS. | § | |
| | § | |
| **CARBON COUNTY TREASURER,** | § | |
| **WYOMING** | § | |
|     Defendant. | § | |
| | § | |
| **VANGUARD OPERATING, LLC,** | § | |
|     Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 18-3249** |
| | § | |
| **PARK COUNTY TREASURER,** | § | |
| **WYOMING** | § | |
|     Defendant. | § | |
| | § | |
| **VANGUARD OPERATING, LLC,** | § | |
|     Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 18-3250** |
| | § | |
| **SWEETWATER COUNTY TREASURER,** | § | |
| **WYOMING** | § | |
|     Defendant. | § | |

## <u>AMENDED MEMORANDUM OPINION</u>

Vanguard Operating, LLC ("Vanguard") commenced adversary proceedings against seven Wyoming Counties to recover ad valorem taxes. Vanguard Operating paid the disputed ad valorem taxes for two separate years prior to filing chapter 11 bankruptcy and after a Final Decree was entered in its bankruptcy case. (*See* Case Nos. 18-03244, 18-03245, 18-03246, 18- 03247, 18-03248, 18-03249, and 18-03250).[1] Vanguard's Complaints seek multiple causes of action against the Counties which include: (i) a declaration of improper Plan distributions for payments made to Campbell, Carbon, Johnson, Natrona, Park, and Sweetwater Counties; (ii) avoidance of the

---

[1] The seven counties are: Sublette, Natrona, Campbell, Johnson, Carbon, Park, and Sweetwater. Campbell County has filed separate responses and summary judgment motions against Vanguard. (*See* Case No. 18-03246).

payments as unauthorized post-petition payments under 11 U.S.C. § 549(a);[2] (iii) avoidance of preferential payments under 11 U.S.C. § 547 for payments made to Campbell, Johnson, and Sublette Counties; (iv) disgorgement of improper Plan distributions made to Campbell, Carbon, Johnson, Natrona, Park, and Sweetwater Counties under 11 U.S.C. § 105; (v) unjust enrichment against the  same; (vi) recovery of the avoided transfers under  11 U.S.C. § 550; and (vii) disallowance of Campbell County's claim under 11 U.S.C. § 502.  (*See* Case Nos. 18-03244, 18-03245, 18-03246, 18-03247, 18-03248, 18-03249, and 18-03250; ECF No. 1).

## Background[3]

Vanguard Natural Resources, LLC, *et al.* was founded in 2006 and began as an oil and gas production company focused on production from the Appalachian Basin.  (Case No. 17- 30560; ECF No. 6 at 4).  Vanguard later expanded its operations by acquiring properties in Texas, New Mexico, Oklahoma, Montana, Mississippi, and Wyoming. (Case No. 17-30560; ECF No. 6 at 4). As oil and gas prices declined in 2014, Vanguard struggled to maintain its revenue and liquidity. (Case No. 17-30560; ECF No. 6 at 22).

Although Vanguard made significant changes to remedy its financial problems, it ultimately filed chapter 11 bankruptcy on February 1, 2017. (Case No. 17-30560; ECF No. 1). Vanguard's chapter 11 reorganization plan was confirmed on July 18, 2017 and went effective on August 1, 2017.  (Case No. 17-30560; ECF Nos. 1109, 1219).  On February 2, 2017, the Court entered the Taxes Order authorizing the payment of prepetition taxes.  (Case No. 17- 30560; ECF No. 59).  On November 9, 2017, the Court entered the Final Decree, closing the cases of certain

---

[2] By stipulation filed on November 9, 2018, Vanguard voluntarily withdrew its causes of action for avoidance of payments under § 549(a) and recovery of those payments under § 550. (Case No. 18-03250; ECF No. 24 at 8).

[3] This background section is intended to provide context and does not constitute findings of fact by the Court.

debtors, excluding Vanguard Natural Resources ("VNR").[4]  (Case No. 17-30560; November 9, 2017 Hearing).

*Wyoming Tax Assessments*

Vanguard's Wyoming oil and gas assets are subject to Wyoming tax laws, which assess an ad valorem property tax on oil and gas that is extracted from reserves.  (Case No. 18-03244; ECF No. 28 at 13).  The ad valorem tax payments benefit local government entities, such as counties.  (Case No. 18-03244; ECF No. 28 at 14).  Under Wyoming's tax statute, ad valorem taxes are calculated, assessed, and billed for the proceeding year's production.  (Case No. 18- 03244; ECF No. 28 at 14).  However, the statute places the burden of evaluating the volume and value of production each year on the taxpayer, who then submits the tax assessment return to the Wyoming Department of Revenue.  (Case No. 18-03244; ECF No. 28 at 15).  The Department of Revenue certifies those values to the counties where they originate.  (Case No. 18-03244; ECF No. 28 at 15).  The county then assumes responsibility for collecting the assessed ad valorem taxes.  (Case No. 18-03244; ECF No. 28 at 15).

Counties issue written tax statements to tax payers on or before October 10, who are then responsible for making payments.  WYO. STAT. ANN. § 39-13-107(b)(i)(C).  The statute allows taxpayers to split the ad valorem taxes into two installments, the first due by November 10, in the same year when statements are issued, and the second due by May 10 of the following year.  (Case No. 18-03244; ECF No. 28 at 15–16).  To ensure compliance, the Wyoming tax statute allows the county to charge an interest rate of 18.00% per annum on any unpaid balance until paid or collected.  WYO. STAT. ANN. § 39-13-108(b)(ii).  A separate section of the statute allows for the

---

[4] The adversary proceedings at issue involve Vanguard Operating, LLC, a subsidiary of VNR. The term "Vanguard" as used in this Memorandum Opinion refers to Vanguard Natural Resources, *et al.* or Vanguard Operating, LLC, the entity which made the payments at issue. The term "VNR" will only be used to refer to the parent company.

assessment of a penalty to taxpayers who fail to promptly report their ad valorem taxes to the Department of Revenue. That penalty is equal to 1.00% of the taxable value of production. WYO. STAT. ANN. §§ 39-13-108(c)(ii)(B) and 39-14-208(d)(ii). However, if the entire tax (both the first and second installment) is paid on or before December 31, "no interest or penalty is chargeable." WYO. STAT. ANN. § 39-13-108(b)(i).

In September 2016, Campbell, Johnson, and Sublette Counties sent Vanguard invoices for its 2016 ad valorem taxes.[5] (Case No. 18-03244; ECF No. 1 at 3–4; Case No. 18-03247; ECF No. 1 at 3; Case No. 18-03246; ECF No. 40 at 6). Vanguard did not pay any of the 2016 ad valorem tax prior to December 31, 2016. (Case No. 18-03244; ECF No. 31 at 4–5). Instead, Vanguard paid the first installment of its 2016 taxes to Campbell, Johnson, and Sublette Counties on January 31, 2017 ("January 2017 Payments") immediately prior to the filing of its bankruptcy petition. (Case No. 18-03244; ECF No. 31 at 5; Case No. 18-03246; ECF No. 40 at 6). In May 2017, Vanguard made the second installment of its 2016 taxes to Campbell, Johnson and Sublette Counties ("May 2017 Payments"). (Case No. 18-03244; ECF No. 28 at 17).[6] The January 2017 Payments are summarized in the table below:

| Date | County | Ad Valorem Taxes Paid |
|------|--------|----------------------|
| 01/31/2017 | Campbell | $268,930.21 |
| 01/31/2017 | Johnson | $321,659.60 |
| 01/31/2017 | Sublette | $2,490,829.74 |

(Case No. 18-03244; ECF No. 28 at 17; Case No. 18-03246; ECF No. 1 at 4).

---

[5] Vanguard's 2016 ad valorem taxes are for oil and gas produced in 2015. (Case No. 18-03244; ECF No. 31 at 4).

[6] Vanguard does not seek to avoid or recover the May 2017 Payments. (Case No. 18-03244; ECF No. 28 at 17). However, in its Complaint, Vanguard seeks disallowance of Claim 311, which represents the May 2017 Payment made to Campbell County. (Case No. 18-03246; ECF No. 1 at 10). In its response, Campbell County claims that the May 2017 Payment represented a timely second installment as to Vanguard's 2016 taxes, thereby satisfying Claim 311. (Case No. 18-03246; ECF No. 40 at 15).

Between September and October 2017, six Wyoming Counties mailed tax assessments to Vanguard for its oil and gas produced in 2016 ("2017 ad valorem taxes").  (Case No. 18-03244; ECF No. 28 at 17; Case No. 18-03246; ECF No. 1 at 5).  After the Final Decree was entered in Vanguard's bankruptcy case on November 9, 2017, Vanguard made the first installment of its 2017 ad valorem taxes to six separate Counties on November 10, 2017 ("November 2017 Payments").  (Case No. 18-03244; ECF No. 28 at 17; Case No. 18-03246; ECF No. 1 at 5).  The November 2017 Payments are summarized in the table below:

| Date | County | Ad Valorem Taxes Paid |
|---|---|---|
| 11/10/2017 | Campbell | $178,665.03 |
| 11/10/2017 | Carbon | $163,655.12 |
| 11/10/2017 | Johnson | $178,665.03 |
| 11/10/2017 | Natrona | $330,058.54 |
| 11/10/2017 | Park | $879,873.80 |
| 11/10/2017 | Sweetwater | $332,144.79 |

(Case No. 18-03244; ECF No. 28 at 17; Case No. 18-03246; ECF No. 40 at 21).

*Vanguard's Seeks to Recover its Ad Valorem Tax Payments*

On August 15, 2018, Vanguard initiated a series of adversary proceedings against the Wyoming Counties which received ad valorem tax payments.  (*See* Case Nos. 18-03244, 18-03245, 18-03246, 18-03247, 18-03248, 18-03249, and 18-03250).  Vanguard's Complaints allege that: (i) the January 2017 Payments to Campbell, Johnson, and Sublette Counties are preferential transfers under 11 U.S.C. § 547, and avoidable under 11 U.S.C § 550; (ii) the November 2017 Payments to Campbell, Carbon, Johnson, Natrona, Park, and Sweetwater Counties are improper plan distributions under Vanguard's confirmed chapter 11 plan of reorganization, which should be disgorged pursuant to 11 U.S.C. § 105, or alternatively that the payments constitute an unjust enrichment to the Counties; and (iii) Campbell County's claim

("Claim 311") should be disallowed under 11 U.S.C. § 502.  (*See* Case No. 18-03244; ECF No. 1; *see also* Case No. 18-03248; ECF No. 1; Case No. 18-03246; ECF No. 1 at 10).

In response to Vanguard's Complaints, Carbon, Natrona, Park, and Sweetwater Counties asserted counterclaims, seeking allowance of late filed proofs of claim pursuant to Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure.  (Case No. 18-03245; ECF No. 19 at 8–9). Campbell County asserted a separate counterclaim seeking similar relief—"leave to file a priority claim for Fiscal 2018 Taxes on the ground of excusable neglect."  (Case No. 18-03246; ECF No. 11 at 19–20). Both Vanguard and the Counties filed cross motions for summary judgment. (Case No. 18-03244; ECF Nos. 28, 31; Case No. 18-03245; ECF Nos. 24, 26).

*Defendants' & Campbell County's Motions for Summary Judgment*

Carbon, Johnson, Natrona, Park, Sublette, and Sweetwater Counties seek summary judgment on the basis that: (i) the November 2017 Payments are voluntary payments pursuant to 11 U.S.C. § 524(f), or were otherwise authorized under the Taxes Order; (ii) the January 2017 Payments are not payments on account of an antecedent debt pursuant to 11 U.S.C. §547(b), because the 18.00% interest rate allowed under the Wyoming tax statute is not a penalty;[7] and (iii) Vanguard is precluded from asserting chapter 5 causes of action under the terms of the Final Decree.  (Case No. 18-03244; ECF No. 28).

The Board of Campbell County's Commissioners ("Campbell County") seeks summary judgment on substantially the same basis as the Counties.  (See Case No. 18-03246; ECF No.  40). Campbell County adds that: (i) recovery of the January 2017 Payment is not only time- barred pursuant to 11 U.S.C. §§ 546(a)(2) and 550(f)(2), but any recovery would not act to benefit the

---

[7] Under § 547(a)(4), the January 2017 Payments would not constitute a preference pursuant to § 547(b) unless there was imposition or exposure to penalty for their non-payment on or before the date on which the payments were made.

bankruptcy estate; and (ii) Claim 311 has been satisfied through the May 2017 Payment, and therefore cannot be disallowed under 11 U.S.C. § 502(b).  (Case No. 18-03246; ECF No. 40).

In opposition, Vanguard alleges that: (i) the November 2017 Payments were improper distributions under the terms of the confirmed plan pursuant to § 105, which were not voluntary, and reliance on the Tax Order is implausible; (ii) the January 2017 Payments were on account of an antecedent debt because the 18.00% interest is a penalty under the Bankruptcy Code, which only requires exposure to penalty under § 547(a)(4); and (iii) disallowance of Claim 311 is necessary, otherwise it would provide Campbell County with double-recovery on a satisfied claim.  (*See* Case No. 18-03244; ECF No. 31).

### *Plaintiff's Motion for Summary Judgment on Counts I, III, and IV*

Vanguard seeks summary judgment against Campbell, Natrona, Johnson, Carbon, Park, and Sweetwater Counties alleging that: (i) the November 2017 Payments are improper distributions that violate the terms of the plan; (ii) the Counties knew or should have known they were not entitled to the November 2017 Payments; and (iii) Campbell, Natrona, Carbon, Park, and Sweetwater Counties cannot satisfy the excusable neglect standard on their counterclaims.  (Case No. 18-03245; ECF No. 24).

The Counties' response largely tracks their own summary judgment motion, arguing that: (i) the November 2017 Payments were not payments made under the plan, but rather were voluntary payments  made by Vanguard or otherwise authorized  under the  Taxes Order; (ii) Vanguard failed to meet the requirements necessary for unjust enrichment; (iii) excusable neglect is a fact-specific inquiry, which cannot be decided on summary judgment; and (iv) John C.  Monroe's Declaration ("the Monroe Declaration"), which Vanguard uses to support its motion,

should be disregarded based on Mr. Monroe's contradicted testimony.  (Case No. 18- 03245; ECF No. 26).

Campbell County's response is substantially similar to the Counties' response. (Case No. 18-03246; ECF No. 42).   Campbell County, however, invokes the doctrine of changed circumstances and the defense of laches. Specifically, Campbell County argues that the November 2017 Payments may not be recovered because: (i) more than 80% of the November 2017 Payment belonged to other independent taxing authorities and those have been disbursed to such taxing authorities; (ii) in accordance with the "budget defense," the small percentage of the November 2017 Payments that did belong to Campbell County "has been used [for the public good] and is no longer available to be recouped;" and (iii) Vanguard's own delay in seeking recovery of the funds "has prejudiced and disadvantaged the County."  (Case No. 18-03246; ECF No. 24 at 15–21).

### Jurisdiction

The District Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a).  This is a core proceeding under 28 U.S.C. § 157(b)(2) (A), (B), and (O).  Pursuant to 28 U.S.C. § 157(a), this proceeding has been referred to the Bankruptcy Court by General Order 2012-6.

### Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  FED. R. BANKR. P. 7056 incorporates FED. R. CIV. P. 56 in adversary proceedings. A party seeking summary judgment must demonstrate the absence of a genuine dispute of material fact by establishing the absence of evidence supporting an essential element of the non-movant's case.  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).  A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder

to find in favor of the non-moving party. *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In cases involving the interpretation of a contract, summary judgment is only appropriate where the language of the contract is unambiguous. *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996); *Cooper Indus., LLC v. Precision Castparts Corp.*, 2016 WL 4939565, at *6 (S.D. Tex. Sept. 14, 2016).

A court views the facts and evidence in the light most favorable to the non-moving party. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Envtl. Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1715 (2016).

A party asserting that a fact cannot be or is genuinely disputed must support that assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact. FED. R. CIV. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Wheat v. Fla Par. Juvenile Justice Comm'n*, 811 F.3d 702, 713 (5th Cir. 2016). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. FED. R. CIV. P. 56(c)(2). Moreover, the Court is not bound

to search the record for the non-moving party's evidence of material issues. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

"The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence entitling the movant to judgment at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 322–24. The non-moving party must cite to specific evidence demonstrating a genuine dispute. FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). Even if the movant meets its initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

<u>Analysis</u>

**I.      The January 2017 Payments**

Vanguard seeks the avoidance of the January 2017 Payments made to Campbell, Johnson, and Sublette Counties pursuant to 11 U.S.C. § 547(a). Resolution of the dispute over the January 2017 payments turns on a peculiarity of bankruptcy preference law. A payment is an avoidable preference only if it was a payment on account of an antecedent debt (among other requirements).

11 U.S.C. § 547(b)(2).  A tax debt is not "incurred" until the "day on which such tax is last payable without penalty . . . ."  11 U.S.C. § 547(a)(4).  It follows that if the payment was made at any time before the "day on which such tax is last payable without penalty", then the payment was not made on account of an antecedent debt.  The difficult issues in this proceeding are: (i) whether the 18.00% charge imposed by Wyoming statute § 39-13-108(b)(ii) includes a penalty of the type referenced in 11 U.S.C. § 547(a)(4); and (ii) whether Vanguard or its officers were exposed to penalties under Wyoming statute § 39-13-108(c)(i)(A), making the January 2017 Payments antecedent debts under 11 U.S.C. § 547(b).

### A.    Whether the 18.00% charge in § 39-13-108(b)(ii) is penalty or interest.

The Counties and Campbell County argue that the January 2017 Payments are not payments on account of an antecedent debt pursuant to 11 U.S.C § 547(b) because the 18.00% interest rate allowed under Wyoming statute § 39-13-108(b)(ii) is not a penalty; therefore, Vanguard's tax obligation was not "incurred" within the meaning of 11 U.S.C. § 547(a)(4).  (Case No. 18-03244; ECF No. 28).  Meanwhile, Vanguard counters that the January 2017 Payments were antecedent debts for the purpose of § 547(b) because the 18.00% interest is a penalty under the Bankruptcy Code, for which only exposure to penalty is required.  (Case No. 18-03244; ECF No. 31).  The Court must determine whether the 18.00% interest rate on unpaid ad valorem taxes allowed under § 39-13-108(b)(ii) is penalty, interest, or both.

Under the Bankruptcy Code, "a debt for tax is incurred on the day when such tax is last payable *without penalty*, including any extension." 11 U.S.C. § 547(a)(4) (emphasis added). Furthermore, the Bankruptcy Code allows a trustee to avoid any transfer of an interest of the debtor in property: "(1) to or for the benefit of a creditor; (2) for or on account of an *antecedent debt* owned by the debtor before such a transfer was made; (3) made while the debtor was insolvent;

(4) made (A) on or within 90 days before the filing of the petition . . .; (5) that enables such creditor to receive more than such creditor would receive if—(A) the case were a case under Chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."  11 U.S.C. § 547(b) (emphasis added).

In order to successfully maintain a preferential transfer action, the burden of proof is upon the party alleging such a transfer, and the burden must be met by a preponderance of the evidence. 11 U.S.C. § 547(g).  Here, that burden must be satisfied by Vanguard, and the elements of § 547(b) must be satisfied conjunctively.  Vanguard and the Counties disagree on the second element of § 547(b)—whether the January 2017 Payments were made for or on account of an antecedent debt. The Counties answer this question in the negative, arguing that by the plain language of Wyoming tax statute § 39-13- 108(b)(ii) no penalty is imposed; therefore, no tax debt was "incurred" under § 547(a)(4).  Vanguard answers in the affirmative, countering that Wyoming tax statutes exposed Vanguard to penalties, which exposure is sufficient to make the January 2017 Payments an incurred tax debt within the meaning of § 547(a)(4) and (b).

*"Penalty" under the Bankruptcy Code*

As noted above, pursuant to 11 U.S.C. § 547, "a debt for a tax is incurred on the day when such tax is last payable *without penalty*, including any extension."  5 COLLIER ON BANKRUPTCY ¶ 574.02[4] (Richard Levin & Henry J. Sommer eds. 16th ed.) (emphasis added).  "Congress provided little explanation for this provision, which limits the number of tax payments to a governmental entity that would be preferential."  *Id*. (citing 124 Cong. Rec. H10089, 1112– 13, 95th Cong., 2nd Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 6436, 6568)).  "Consequently, if taxes are paid before a penalty [may be] imposed, the tax debt is not antecedent and no preference

exists."  5 COLLIER ON BANKRUPTCY ¶ 574.02[4] (Richard Levin & Henry J. Sommer eds. 16th ed.).

Vanguard argues that "in determining whether a particular tax is a penalty *for purposes of the Bankruptcy Code*, the United States Supreme Court looks behind the label placed on the exaction and rests its answer directly on the operation of the provision using the term in question." (Case No. 18-03244; ECF No. 31 at 16 (emphasis added) (citing *United States v. Reorganized CF & I Fabricators of Utah, Inc*., 518 U.S. 231, 220 (1996))).  In essence, Vanguard argues that in determining what a penalty is under § 547(a)(4), the Court must look beyond the label provided in the Wyoming statute—here, that label is "interest."  Specifically, the Court must look to the Bankruptcy Code's definition of what constitutes a penalty, and not allow state law to define and redefine both what a "penalty" is and consequently what constitutes a preference for the purpose of § 547(b).  (Case No. 18-03244; ECF No. 31 at 16 ("These foundational principles of bankruptcy law would be undermined if states could control their preference exposure by strategically drafting and applying the penalty provisions of their taxations statutes.)).

Most case law that discusses and defines the term "penalty" under provisions of the Code, do so in the context of differentiating between a "tax" and a "penalty."[8]  *See U.S. v. Sotelo*, 436 U.S. 268, 292 (1979) (concluding funds were "taxes" for purposes of the Bankruptcy Act); *United States v. Reorganized CF & I Fabricators of Utah, Inc*. 518 U.S. 231, 220 (1996) (discussing whether liability incurred "is an excise tax" under § 507(a)(8)(E), "or is a penalty to be treated as a general unsecured claim"); *In re Matlock*, 104 B.R. 389, 390 (Bankr. N.D. Okla. 1989) ("In short, the issue is whether the '100% penalty' of 26 U.S.C. § 6672 is a *penalty* within 11 U.S.C. §

---

[8] There is also a subset of case law that defines "fine, penalty, or forfeiture" for the purpose of determining whether a debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(7).  *See Richmond v. N.H. Supreme Court Comm. on Prof'l Conduct*, 542 F.3d 913 (1st Cir. 2008).

523(a)(7)(B), or a *tax* within 11 U.S.C. § 523(a)(1)(A) ”); *In re Cassidy*, 983 F.2d 161, 161–62

(10th Cir. 1992) (determining whether the assessment is a tax or penalty for priority purposes); *In*

*re Cespedes*, 393 B.R. 403, 405 (Bankr. E.D. 2008) (“The IRS contends that if the liability is a

penalty, it is a penalty ‘in compensation for actual pecuniary loss,’ and so entitled to priority under

§ 507(a)(8)(G).”); *In re Daley*, 315 F.Supp.3d 679, 682 (D. Mass. 2018) (discussing “whether an

exaction is a tax or penalty for purposes of establishing priority of a claim”).  Specifically, courts

have most often defined “penalty” under the Code for purposes of determining priority of

payments under 11 U.S.C. § 726.

“Section 726(a) sets forth the distribution rules for a liquidation case under chapter 7.”  6

COLLIER ON BANKRUPTCY ¶ 726.02 (Richard Levin & Henry J. Sommer eds. 16th ed.).

Meanwhile, “Section 507(a) sets forth ten categories of claims that are entitled to priority in

bankruptcy cases.”  4  COLLIER ON BANKRUPTCY ¶ 507.01 (Richard Levin & Henry J. Sommer

eds. 16th ed.).[9]  Under § 727(a)(4), fourth in payment, are allowed secured or unsecured claims

for any fine, penalty or forfeiture . . . arising before the earlier of the order for relief or the

appointment of a trustee, to the extent that the fine, penalty, or forfeiture, or damages are not

compensation for actual pecuniary loss to the claimholder.”  6 COLLIER ON BANKRUPTCY ¶ 726-

11[4] (Richard Levin & Henry J. Sommer eds. 16th ed.).[10]  Thus, § 726(a)(4) includes prepetition

tax penalties if they are not compensation for actual pecuniary loss.  *Id*.  “On the  other hand,

§ 507(a)(8)(G) gives eighth priority to allowed unsecured claims of governmental units for tax

---

[9] “First in payment, under section 726(a)(1), are priority claims, i.e., claims of the kind and in the order specified in section 507.” 6 COLLIER ON BANKRUPTCY ¶ 726.02[1] (Richard Levin & Henry J. Sommer eds. 16th ed.).

[10] Hence, in an individual chapter 7 case, fines and penalties, when owed to a governmental unit, receive low priority in distribution but continue to be owed by the debtor after the case.  *Id*.  6 COLLIER ON BANKRUPTCY ¶ 726-11[4] (Richard Levin & Henry J. Sommer eds. 16th ed.).

liabilities referred to as penalties but that are in fact compensation for actual pecuniary loss."[11] *Id.*; *see In re Pheasant Cove, LLC*, 2008 WL 187529, at *5 (Bankr. D. Idaho Jan. 18, 2008) ("Thus, whereas the compensatory portion of the tax penalty claim is subordinate in distribution under § 726(a)(4), any compensatory portion of such claim receives priority status in order of distribution under § 507(a)(8)(G) and § 726(a)(1).").

Legislative history as to the Bankruptcy Reform Act provides further insight on priority under the Bankruptcy Code between taxes and penalties:

> For purposes of the above priority rules, the House amendment adopts the provision of the Senate bill that any tax liability which, under otherwise applicable tax law, is collectible in the form of a "penalty," is to be treated in the same manner as a tax liability. In bankruptcy terminology, such tax liabilities are referred to as pecuniary loss penalties. Thus, any tax liability which under the Internal Revenue Code or State or local tax law is payable as a "penalty," in addition to the liability of a responsible person under section 6682 of the Internal Revenue Code, will be entitled to the priority which the liability would receive if it were expressly labeled as a "tax" under the applicable tax law. However, a tax penalty which is punitive in nature is given subordinated treatment under section 726(a)(4).
>
> The House amendment also adopts the Senate amendment provision limiting the nondischargeability of punitive tax penalties, that is, penalties other than those which represent collection of a principal amount of tax liability through the form of a "penalty." Under the House amendment, tax penalties which are basically punitive in nature are to be nondischargeable only if the penalty is computed by reference to a related tax liability which is nondischargeable . . . .

124 Cong. Rec., H11112–3 (daily ed. September 28, 1978), *reprinted in* U.S. Code Cong. & Admin. News, 95th Cong., 2nd Sess. 1978, p. 6436, 6568 (emphasis added).  Thus, "taxes" are those that compensate for actual pecuniary loss, while a "penalty" is that which has punitive characteristics.

---

[11] "The portion of the claim receiving this priority status would be first in order of distribution under section 726(a)(1), whereas the noncompensatory portion of the tax penalty would be fourth in order of distribution under section 726(a)(4)."  6 COLLIER ON BANKRUPTCY ¶ 726-11[4] (Richard Levin & Henry J. Sommer eds. 16th ed.).

Notably, subordination under § 726(a)(4) "applies to a 'fine, penalty, or forfeiture, or for multiple, exemplary or punitive damages,' regardless of whether the debt is owed to a governmental unit or a private entity." 6 COLLIER ON BANKRUPTCY ¶ 726-11[4] (Richard Levin & Henry J. Sommer eds. 16th ed.). The issue, however, sometimes becomes "whether a particular debt is one that is in the nature of a penalty." *Id.*

In *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, the chapter 11 debtor failed to make required pension plan contributions and was assessed a 10.00% funding deficiency pursuant to 26 U.S.C § 4971(a). 518 U.S. 231, 216 (1996). The Government sought priority for the claim, either as an "excise tax" within the meaning of § 507(a)(7)(E) or as a tax penalty in compensation for pecuniary loss under § 507(a)(7)(G). *Id.* at 217. In determining whether the government's claim was entitled to priority under either provision, the Supreme Court "looked behind the label placed on the exaction and rested its answer directly on the operation of the provision using the term in question." *Id.* at 220. Initially, the Court distinguished between a penalty and a tax:

> A tax is an enforced contribution to provide for the support of government;
> a penalty as the word is here used, is an exaction imposed by statute as
> punishment for an unlawful act . . . if the concept of penalty means anything,
> it means punishment for an unlawful act or omission, and a punishment for
> an unlawful omission is what this exaction is.

*Id.* at 224 (citing *United States v. La Franca*, 282 U.S. 568, 572 (1931)). The Supreme Court then looked to § 4971's legislative history, identifying the statute as punitive in nature. *Id.* at 226 ("The bill also provides new and more effective penalties where employers fail to meet the funding standards."). Thus, the Court concluded that in light of "the patently punitive function of § 4971 . . . [it] must be treated as imposing a penalty, not authorizing a tax." *Id.*

Other courts have followed similar patterns, looking to the purpose, nature, and characteristics of the statute to determine whether the rate constitutes tax or penalty. *Matter of Unified Control Sys., Inc.*, 586 F.2d 1036, 1038 (5th Cir. 1978) ("Tax penalties are imposed at least in part as punitive measures against persons who have been guilty of some default or wrong."); *In re Cassidy*, 983 F.2d 161, 165 (10th Cir. 1992) (noting the "penalty is a flat rate penalty bearing no relationship to the direct financial loss of the government," which indicated "an intent to punish, not to defray costs"); *In re Mounier*, 232 B.R. 186, 192–93 (Bankr. S.D. Cal. 1998) ("Such amount is not intended to provide for the support of the government. The exaction imposed by § 72(t) simply does not have the characteristics of a traditional tax."); *In re Daley*, 315 F. Supp. 3d 679, 683–84 (determining § 72(t) was a penalty where: (i) "the primary purpose . . . is to deter taxpayers from taking early withdrawals from their retirement accounts"; (ii) imposed on IRAs, "from which the government generally expects no tax revenue"; and (iii) there was "no indication that the government suffered any actual pecuniary loss for which it seeks compensation").

In similar fashion, courts seeking to determine whether a default interest rate pursuant to a contract is a penalty under the Bankruptcy Code look to the interest rate's characteristics. *See In re Wright*, 88 B.R. 498, 511 (Bankr. D. Mass. 1998) ("[T]he Court finds that the default rate at issue here is nothing more than a device (akin to a sledgehammer) to coerce the Debtors into prompt payment."); *see In re Pheasant Cove, LLC*, 2008 WL 187529, at *6 (Bankr. D. Idaho Jan. 18, 2008) ("The Court concludes that a 'penalty' under § 726(a)(4) includes only punitive, noncompensatory obligations intended to punish the debtor for his wrongdoing.").

In conclusion, legislative history and case law suggest that: (i) the label of the charge at issue is not determinative; (ii) a penalty is that which is punitive in nature, intended solely or

primarily to punish the debtor; and (iii) most importantly, if the rate assessed is to be considered something other than a "penalty" under the Code, it must bear some relationship to the direct financial loss of the government—it must be in compensation for actual pecuniary loss.  Thus, in accordance with legislative history and case law, the Court will look to § 39-13-108(b)(ii)'s purpose, nature, and characteristics to determine whether it is a "penalty" for purposes of the Bankruptcy Code.

*Wyoming Ad Valorem Taxes*

The statutes governing Wyoming ad valorem property taxes are found in Chapters 13 and 14 of Title 39 of the Wyoming Statutes.  (Case No. 18-03244; ECF No. 28 at 14).  Chapter 13 sets forth the general statutory scheme governing ad valorem property taxes, while Chapter 14 deals mostly, but not exclusively, with severance taxes, which are not at issue in this case.  (Case No. 18-03244; ECF No. 28 at 14).  The following provisions are at the center of the dispute before the Court:

> (b)     Interest. The following shall apply:
>
>> (i)     Taxes provided by this act are due and payable at the office of the county treasurer of the county in which the taxes are levied. Fifty percent (50%) of the taxes are due on and after September 1 and payable on and after November 10 in each year and the remaining fifty percent (50%) of the taxes are due on and after March 1 and payable on and after May 10 of the succeeding calendar year except as hereafter provided. If the entire tax is paid on or before December 31, no interest or penalty is chargeable;
>>
>> (ii)     The balance of any tax not paid as provided by paragraph (i) of this subsection is delinquent after the day on which it is payable and shall bear *interest* at eighteen percent (18%) per annum until paid or collected . . . .

WYO. STAT. ANN. § 39-13-108(b)(i)-(ii) (emphasis added).  A separate section sets out offenses and penalties for failure to comply with the Wyoming tax statutes:

       (i)       Offenses. The following shall apply:

             (A)     *Any officer neglecting or refusing to comply with any requirement of this act* for which no other penalty is provided, may be fined not to exceed one thousand dollars ($1,000.00) to be recovered against him and his sureties;

       (ii)     Penalties. The following shall apply:

             (C)     If any person *fails to file the reports for ad valorem purposes* required by chapter 14 of this title by the due date or any extension thereof, the department may impose a *penalty* equal to a total of one percent (1%) of the taxable value of the production from the well, mine or mining claim but not to exceed five thousand dollars ($5,000.00) for each calendar month or portion thereto that the report or information is late . . .

WYO. STAT. ANN. § 39-13-108(c)(i)(A), (c)(ii)(C).   The initial inquiry is whether the 18.00% interest rate allowed in § 39-13-108(b)(ii) constitutes a penalty.

The parties agree that *Hardee v. Internal Revenue Serv. (In re Hardee),* 137 F.3d 337, 341 (5th Cir. 1998) sets the appropriate federal standard for determining whether the 18.00% rate in § 39-13-108(b)(ii) is interest or penalty.   (Case No. 17-30560; ECF No. 2332 at 77).   The Fifth Circuit has established four factors in determining whether an interest rate constitutes interest or penalty: (1) the language of the provision, (2) the form of the sanctions, (3) the confiscatory nature of the sanction, and (4) the legislative history of the provision.   *In re Hardee*, 137 F.3d at 341. None of the factors are dispositive, rather they must be construed as a whole.   *Id*. (first  citing *CF & I Fabricators*, 518 U.S. at 216 (finding a 10.00% sanction to be a penalty based upon the legislative history of the provision and its function); then citing *Meilink v. Unemployment Reserves Comm'n of the State of California,* 314 U.S. 564, 569–70 (1942) (finding a 12.00% interest rate . . . to be interest and not a penalty based upon its function, form, and label))).

a.    *The Language of the Provision*

The language of § 39-13-108(b)(ii) denominates the 18.00% rate as interest.  *In re Hardee*, 137 F.3d at 341.  Furthermore, the 18.00% rate for delinquent ad valorem taxes is listed under the title "Interest" rather than under the "Penalties" title. WYO. STAT. ANN. § 39-13- 108(b)(ii).  Under the "Penalties" label with regard to ad valorem taxes, the Wyoming legislature specifically set out a 1.00% penalty "of the taxable value of [] production" for failure to file ad valorem tax reports. WYO. STAT. ANN. § 39-13-108(c)(ii)(C).  Meanwhile, the Wyoming tax statutes pertaining to severance taxes authorize an 18.00% interest rate on delinquent taxes in the same fashion as the ad valorem tax provisions, but separately include a penalty provision for late payment of severance taxes.[12]  WYO. STAT. ANN. § 39-14-208(d)(iii).  "Labels are not dispositive, but the placement of the provision and its label are informative . . . when considered in relation to how Congress has denominated and placed provisions that it considers to be penalties."  *In re Hardee*, 137 F.3d at 341.  Thus, this factor weighs in favor of finding the 18.00% rate in § 39-13-108(b)(ii) as interest.[13]

b.    *The Form of the Sanction*

The 18.00% rate is applied over time, as traditional interest normally is, accruing on unpaid ad valorem taxes until the balance is "paid or collected."  WYO. STAT. ANN. § 39-13- 108(b)(ii); *In re Hardee*, 137 F.3d at 341 ("It is compounded daily and only accrues while the debt is overdue and remains unpaid. The taxpayer can end the imposition of the interest by paying the tax debt."). Thus, the form, like language, suggests this is an interest.

---

[12] The Wyoming tax statutes include a separate provision that provides a 5.00% penalty "[i]f any part of a severance tax deficiency is due to negligence or intentional disregard of rules and regulations." WYO. STAT. ANN. § 39-14-208(d)(iv).

[13] The Fifth Circuit in *Hardee* specifically addressed the Supreme Court's decision in *CF & I Fabricators*. The Fifth Circuit noted that while the Supreme Court made it clear that courts should look beyond the labels given, "labels can inform a determination." *In re Hardee*, 137 F.3d at 341. Thus, "the fact that a statute labeled different exactions as a penalty and as interest was relevant [in determining] whether the interest was a penalty." *Id.* (citing *United States v. Childs*, 266 U.S. 304, 309–10 (1924)).

c.       *The Confiscatory Nature of the Sanction*

Vanguard contests the third factor more than any other. It argues that "Wyoming's 18% interest rate is a penalty for noncompliance with timely payment obligations because it significantly exceeds the pecuniary loss to the state from late payment." (Case No. 18-03244, ECF No. 31 at 14).  As support for its argument, Vanguard cites various interest rates from various commercial lenders, noting that "it would have been cheaper to borrow money from a number of sources, including even credit cards, than to incur the 18% interest rate." (Case No. 18-03244; ECF No. 31 at 17).  However, interest accounts for more than a taxpayer's potential borrowing rates from separate lenders.

The Supreme Court in *Meilink*, noted that:

> It is common knowledge that interest rates vary not only according to the general use of value of money but also according to the hazard of particular classes of loans. Delinquent taxpayers as a class are a poor credit risk; tax default, unless an incident of legitimate tax litigation, is, to the eye sensitive to credit indications, a signal of distress. A rate of interest on tax delinquencies which is low in comparison to the taxpayer's borrowing rate—if he can borrow at all—is a temptation to use the state as a convenient, if involuntary, banker by the simple practice of deferring payment of taxes. Another variable is the amount necessary to compensate for the trouble of handling the item. The legislature may include compensation to the state for the increased costs of administration in the exaction for delay in paying taxes without thereby changing it from interest to penalty.

*Meilink v. Unemployment Reserves Comm'n of State of California*, 314 U.S. 564, 567 (1942). Therefore, the Supreme Court "acknowledged that an exaction having *in part* a deterrent effect does not make that exaction a penalty." *In re Hardee*, 137 F.3d at 341 (emphasis added).

Although Vanguard claims that the interest rate significantly exceeds the pecuniary loss to the state from its late payment, the record is devoid of any evidence setting out the Counties' pecuniary loss, if any, for a taxpayer's failure to timely pay taxes.  Furthermore, the Fifth Circuit

highlighted that "risk is an important factor causing interest rates to vary from a general compensatory rate"; however, there is no evidence suggesting what rate of interest is appropriate given the risk, if any, to the Counties, or the amount necessary to compensate for the trouble of handling late or nonpayment of taxes, if any.

Thus, without the ability to consider both the risk at issue to the Counties, their actual pecuniary loss, and any possible added costs for handling late payments, the Court is unable to asses whether the rate charged is confiscatory in nature, or is nothing more than interest with an added deterrent effect.  *See Hardee,* 137 F.3d at 341 (holding an increased rate between 1.8%  and 2.6% over the regular interest rate (which ranged between 10.8% and 15.6%) was interest and not confiscatory); *Unified Control Sys*., 586 F.2d at 1038–39 (finding a 200% excise tax confiscatory); *Meilink*, 314 U.S. at 392 (finding a 12% interest rate (2% higher than the maximum allowable private rate under the state constitution) to be interest and not penalty based upon its function, form, and label); *In re Wright*, 88 B.R. at 511 (finding a 48.00% default rate confiscatory because it was nothing more than a device to coerce the Debtors into prompt payment).

    *d.*  *The Legislative History of the Provision*

There is little to no useful legislative history in Wyoming as it pertains to the ad valorem tax statutes and their meaning.  (Case No. 18-03244; ECF No. 28 at 39 (quoting *Bd. of Cty. Comm'rs of the Cty. of Laramie v. Laramie Cty*. *Sch. Bd*., 884 P.2d 946, 956 (Wyo. 1994)). However, an examination of the Wyoming Supreme Court's interpretation of § 39-13-108(b)(ii) is useful.

Vanguard emphasizes that the Supreme Court of Wyoming has "recognized that the purpose of interest is to serve as compensation for the use of money, *or* as a penalty, *or* it may constitute a part of the tax." *Kunard v. Enron Oil & Gas Co.,* 869 P.2d 132, 135 (Wyo. 1994)

(emphasis added).  It further implies that *Kunard* made it clear that the 18.00% rate in this particular statute is a penalty, which prevents taxpayers from undervaluing gross production . . . ." *Id*.  In *Kunard*, the Supreme Court of Wyoming held that "tax is delinquent upon the taxpayer's failure to pay on the date due," not at the later date of notice and demand.  *Amoco Prod. Co. v. Bd of Cty. Comm'rs of Cty. of Sweetwater*, 2002 WY 154, ¶ 37, 55 P.3d 1246, 1257 (Wyo. 2002).

It is clear that in the time surrounding *Kunard*, the Supreme Court of Wyoming was concerned with underreporting, which would then lead to underpayment of taxes.  *Moncrief v. Wyo. State Bd. of Equalization*, 856 P.2d 440, 445 (Wyo. 1993) ("If . . . all taxpayers could intentionally undervalue the mineral and make an inaccurate payment on the undervaluation for severance tax purposes without fear of paying interest upon discovery, there would be no reason for the taxpayer to make the correct payment."); *Kunard*, 869 P.2d at 135 (noting that assessing interest from the date of notification and demand "would permit the taxpayer to undervalue gross production without the risk of penalty and would allow the taxpayer the free use of the unpaid tax dollars."); *Amoco*, 2002 WY 154, ¶ 38, 55 P.3d 1246, 1257 ("[T]o hold otherwise would simply foster underreporting by the taxpayer in hopes that the taxpayer could illegally avoid the payment of tax in total . . . .").  As it stood at the time of these decisions, the statute provided as follows:

> The *balance* of any tax not paid as provided by subsection (a) of this section is delinquent after the day on which it is payable and shall bear interest at eighteen percent (18%) per annum until paid or collected.

WYO. STAT. ANN. § 39-3-101(b)[14] (1990) (emphasis added).  Thus, Vanguard is correct that the Wyoming legislature was protecting itself from deficient or false reporting by taxpayers.  This provision would ensure that if and when the taxing authority discovered the underreporting and subsequent underpayment, the balance of that underpayment, caused by purposeful or negligent

---

[14] The statute is now § 39-13-108(b)(ii), which is currently at issue in this adversary proceeding.

underreporting, would be subject to an 18.00% interest until paid or collected.  This interest would "partially compensate the taxing authority which has been deprived of the use of the unpaid overdue tax monies over the delinquency period."  *Amoco*, 2002 WY 154, ¶ 38, 55 P.3d 1246, 1257.  Furthermore:

> Given the fact that the Wyoming taxing statutory scheme relies upon reporting by taxpayers, the existence of the assessment of statutory interest provides an *incentiv*e to assure the taxpayer truly and accurately submits the required reports. The imposition of statutory interest will also ensure that taxpayers who improperly file inaccurate reports or attempt to delay the taxing process are not unjustly rewarded.

*Amoco*, 2002 WY 154, ¶ 38, 55 P.3d 1246, 1257 (citing *Kunard*, 869 P.2d at 135) (emphasis added).  The rate thus has a two-fold purpose: deter (the taxpayer) and compensate (the taxing authority) for time and value lost.  *Hardee*, 137 F.3d at 314 (citing *Meilink* for the proposition that "an exaction having in part a deterrent effect does not make that exaction a penalty").

Although at times the Supreme Court of Wyoming uses the terms "penalty" and "interest" interchangeably, the definition for *interest rate*, fits much more squarely within the Supreme Court of Wyoming's interpretation of the legislature's intent.   *Compare Penalty*, BLACK'S LAW DICTIONARY (11th Ed. 2019) ("[A] sum of money exacted as punishment . . . (as distinguished from compensation for the injured party's loss).") *with Interest Rate*, BLACK'S LAW DICTIONARY (11th Ed. 2019) ("The percentage that a borrower of money must pay to the lender in return for the use of the money, [] expressed as a percentage of the principal payable  for a one-year period."). Rather than serve as punishment, the Supreme Court of Wyoming notes that the rate's purpose is to compensate the taxing authority for the time and money lost while the taxpayer made use of money owed, and to discourage future reporting discrepancies, which would then minimize underpayment incidents.  *In re Hardee*, 137 F.3d at 342 ("At most, this association highlights the

deterrent effect that Congress intended the provision to have in order to aid in easing the burden on the system of tax dispute resolution.").

Notably, the Wyoming legislature did provide a penalty provision for failure to report ad valorem taxes, thereby highlighting its concern with underreporting, which then lead to underpayment of taxes. WYO. STAT. ANN. § 39-13-108(c)(iii). The legislature, however, did not add anything denominated as a "penalty" for non-payment of taxes—the situation at issue here.[15] *See* WYO. STAT. ANN. § 39-13-108.

Although Wyoming case law provides a backdrop for § 39-13-108(b)(ii), the Supreme Court of Wyoming's analysis of the statute focuses on situations in which a taxpayer underreported taxes, which then led to substantial underpayments, rather than nonpayment, which is at issue in this case. Therefore, although useful, it is not determinative. In light of the sparse legislative history provided for § 39-13-108(b)(ii), the Court cannot discern whether the interest is in compensation for the Counties' actual pecuniary loss or provided solely or primarily to punish noncompliant taxpayers. If any part of the 18.00% charge is a nonpecuniary loss penalty, used primarily or solely to punish a noncompliant taxpayer, then the debt would be antecedent under § 547(a). If, however the 18.00% rate only includes a pecuniary loss penalty, used to compensate the Counties for time and value lost, and therefore is interest with an added deterrent effect, then the tax debt would not be antecedent under § 547(a)(4). The Court need not determine the precise allocation between penalty and interest.

As provided above, the record is devoid of any evidence providing for the Counties' actual pecuniary loss caused by Vanguard's underpayment or nonpayment of taxes. Furthermore,

---

[15] It is also important to highlight that Wyoming tax statutes pertaining to *severance* taxes (not ad valorem taxes that are at issue here) include penalty provisions for nonpayment or underpayment of taxes. The tax statutes include a separate provision that provides a 5.00% penalty "[i]f any part of a severance tax deficiency is due to negligence or intentional disregard of rules and regulations." WYO. STAT. ANN. § 39- 14-208(d)(iv).

although Wyoming case law suggests that § 39-13-108(b)(ii) provides for a deterrent effect and compensation to the Counties for the time and money spent, the Court cannot discern how much, if any, of the 18.00% charge is used to compensate the Counties, and how much, if any, is used to coerce compliance or to punish a noncompliant taxpayer. Additionally, it is not possible for the Court to determine whether the range of interest is reasonable provided the risk and the expense to the Counties, because the record lacks evidence of both risk and expenses. Therefore, the Court cannot conclude as a matter of law that the 18.00% rate in § 39- 13-108(b)(ii) is interest rather than a penalty.

### B.    Whether there was exposure to penalty under § 39-13-108(c)(i)(A).

The Court now turns to the second question of whether exposure to penalties under the Wyoming tax statutes is sufficient to make the taxes that were paid in January 2017 antecedent debts under the Bankruptcy Code.

Vanguard argues that the Court's focus should be on the language of § 547(a)(4), which finds an antecedent tax debt under the Bankruptcy Code on the date in which a taxpayer was exposed to a penalty, rather than the date on which the penalty is actually assessed. (Case No. 18-03244; ECF No. 31 at 6). Vanguard alleges that under the Wyoming tax statutes it was exposed to penalties on three separate occasions: (i) February 8, 2016, when it was required to provide the operator with an annual summary of monthly volumes; (ii) February 25, 2016, when it was required to file reports for ad valorem taxes; and (iii) November 10, 2016, when it was required to pay the first half installment of its 2016 ad valorem taxes. (Case No. 18-03244; ECF No. 31 at 9–10). Thus, in light of the fact that Vanguard was exposed to penalties under the Wyoming tax statutes, whether or not the 18.00% interest rate in § 39-13-108(b)(ii) is penalty or interest is

irrelevant. Under Vanguard's view, the January 2017 Payments are antecedent debts under the Code. (Case No. 18-03244; ECF No. 31 at 7–11).

Vanguard cites *United States v. Pullman Constr. Indus. Inc.*, 210 B.R. 302, 307 (N.D. Ill. 1997) for the proposition that the relevant date for purposes of § 547(a)(4) is the date in which the debtor was exposed to penalties. (Case No. 18-03244; ECF No. 31 at 8). In Pullman, the taxpayer was required to deduct and withhold income and social security taxes from gross wages earned by his employees. 210 B.R. at 304. Thereafter, Pullman was obligated to deposit those taxes with a qualified federal tax depository before remitting the withheld amounts to the IRS. *Id.* Failure to do so authorized the IRS to assess a 10.00% penalty, unless the failure was due to a reasonable cause. *Id.* at 305. Pullman failed to make the required deposits for some of the withheld funds. *Id.* The court held that the relevant point for purposes of § 574(a)(4) is "the date on which the debtor is exposed to penalties, rather than the date the penalty is actually assessed or the date on which the debtor filed its quarterly return." *Id.* at 307. Thus, the payments were incurred for purposes of § 547(a)(4) on the date on which Pullman was required to deposit his taxes but failed to do so. *Id.*; *see Sicherman v. Jelm (In re Harvard Mfg. Corp.),* 97 B.R. 879, 882–83 (Bankr. N.D. Ohio 1989) ("[T]he Debtor's tax debt was created when it failed to make the timely deposits as required under the IRS regulations."); *see also In re American Int'l Airways, Inc*., 83 B.R. 324, 330–31 (Bankr. E.D. Pa. 1988) ("[T]he debtor's failure to make withholding tax deposits within three business days of respective payroll dates subjected it to penalties and that imposition of those penalties caused the taxes to be due when the deposits were to be made.").

This Court agrees that it is the potential for a penalty that matters. It appears that Congress intended to create a bright line rule for when a tax becomes an antecedent debt. If the potential for a penalty causes a debtor to pay, the date on which the debt was due would not change. Under the

Counties' interpretation, the due date for the taxes would never be established under the Bankruptcy Code in situations where penalties were available but not imposed upon a taxpayer's default.

Neither party disputes that the Wyoming tax statutes provide for the imposition of a penalty if the taxpayer fails to file reports for ad valorem tax purposes.  (Case No. 18-03244; ECF No. 31 at 9); WYO. STAT. ANN. § 39-13-108(c)(iii)(C).  However, under § 547(a)(4) a tax debt is incurred on the "date on which such tax is last payable without penalty."  The report filing date is unrelated to the date on which Vanguard's debt was incurred based on its nonpayment of taxes.  It is inapplicable to the issue before the Court.  *Pullman,* 210 B.R. at 309 (holding the payment was not an antecedent debt pursuant to § 547(a)(4), because "Pullman did not demonstrate, as it did with the first three disputed payments, that it was subject to imposition of a penalty for failure to make a timely deposit or payment").

Precisely the same logic applies to the filing of the annual summary of monthly volumes. (Case No. 18-03244; ECF No. 31 at 9).  Those penalties were not related to payment.

Lastly, Vanguard contends that it was also exposed to penalties on November 10, 2016, pursuant to § 39-13-108(c)(i)(A) when it failed to pay the first-half installment of its 2016 ad valorem taxes.  In September 2016, Campbell, Johnson, and Sublette Counties sent Vanguard invoices for its 2016 ad valorem taxes.  (Case No. 18-03244; ECF No. 1 at 3–4; Case No. 18-03247; ECF No. 1 at 3; Case No. 18-03246; ECF No. 40 at 6).  Vanguard did not pay any of the 2016 ad valorem tax prior to December 31, 2016.  (Case No. 18-03244; ECF No. 31 at 4–5). Instead, Vanguard paid the first installment of its 2016 taxes to Campbell, Johnson, and Sublette Counties on January 31, 2017, immediately prior to the filing of its bankruptcy petition.  (Case

No. 18-03244; ECF No. 31 at 5; Case No. 18-03246; ECF No. 40 at 6).  Vanguard argues that this

late payment exposed it to penalties under the following:

> (i)      Taxes provided by this act are due and payable at the office of the county in which the taxes are levied. Fifty percent (50%) of the taxes are due on and after September 1 and payable on and after November 10 in each year and the remaining fifty percent (50%) of the taxes are due on and after March 1 and payable on and after May 10 of the succeeding calendar year except as hereafter provided. *If the entire tax is paid on or before December 31, no interest or penalty is chargeable*;

> (ii)      The balance of any tax not paid as provided by paragraph (i) of this subsection is delinquent after the day on which it is payable and shall bear interest at eighteen percent (18%) per annum until paid or collected . . . .

WYO. STAT. ANN. § 39-13-108(b)(i)–(ii) (emphasis added).  As set forth above, the Court is unable

to determine as a matter of law whether the 18.00% rate exposed Vanguard to penalties, such that

it incurred a tax debt within the meaning of § 547(a)(4).  However, Vanguard argues that even if

the 18.00% rate is interest rather than penalty, it was exposed to penalties through its officers under

§ 39-13-108(c)(i)(A)—a separate provision within the same statute.  That provision reads as

follows:

> (i)      Offenses. The following shall apply:

> (A)      Any *officer* neglecting or refusing to comply with any requirement of this act *for which no other penalty is provided*, may be fined not to exceed one thousand dollars ($1,000.00) to be recovered against him and his sureties.

WYO. STAT. ANN. § 39-13-108(c)(i)(A) (emphasis added).  Specifically, Vanguard argues that this

"catch-all" provision exposed it to penalties through its "indemnification obligation to its officers."

(Case No. 18-03244; ECF No. 31 at 10 (citing *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th

Cir. 2002)).  In support of its argument, Vanguard points to the Confirmation Order, which

provides that "[t]he Debtors' directors, officers, and managers:  .  .  . (c) are entitled to

indemnification from the Debtors under state law, organizational documents, and agreements." (Case No. 17-30560; ECF Nos. 1109 at 15; *see* 2332 at 118 ("The Debtor[] obviously owes indemnification obligations to its officers and this makes the penalty effectively a penalty on the Debtor itself.")).

The Counties counter that the term "officer" as used in § 39-13-108(c)(i)(A), refers to county and state officials who have statutory responsibilities for the assessment and administration of taxes.  (Case No. 17-30560; ECF No. 2332 at 90).  Specifically, the Counties point to other provisions within Chapter 13 of Title 39 of the Wyoming Statutes, noting that "at every other place in the statute where the word is used, it is used in a sequence of references to persons associated with a state or any political subdivision."  (Case No. 17-30560; ECF No. 2332 at 135).  Therefore, Vanguard was not exposed to penalties, and no preference exists.

The Wyoming tax statutes do not provide a definition for the term "officer."  However, looking at the statute as a whole, it is clear that the term "officer" under § 39-13-108(c)(i)(A) includes officers of a corporation, such as Vanguard. First, both provisions are located within the "Enforcement" section in Chapter 13 of Title 39 of the Wyoming Statutes. *See* WYO. STAT. ANN. § 39-13-108.  Contrary to the Counties' argument, although other sections of Chapter 13 of the Wyoming Statutes use the term "officer" to refer to "county and state officials who have statutory responsibilities for assessment and administration of taxes", this section is specific to the enforcement of taxes owed.  (*See* Case No. 17-30560; ECF No. 2332 at 90).  Thus, the provisions of § 39-13-108 are meant to further compliance with the Wyoming tax statutes, rather than the taxes' assessment or administration.

Specifically, § 39-13-108(c)(i)(A) is located under the label "Offenses and Penalties" of the Enforcement statute, which sets out the following in addition to the provision stated above:

(A)     Any county treasurer, or person acting on his behalf, failing to comply with any provision of paragraph (e)(ii) of this section is guilty of a misdemeanor and upon conviction thereof may be fined not to exceed on hundred dollars ($100.00);

(B)     Any person is guilty of a misdemeanor punishable upon conviction by a fine of not more than ten thousand dollars ($10,000.00) if he:

(I)     Knowingly fails to file the statement required under W.S. 39-14- 107(a)(i)(A), 39-14-207(a)(i), 39-14-307(a)(i), 39-14-407(a)(i), 39-14- 507(a)(i), 39-14-607(a)(i) and 39-14-707(a)(i);

(II)    Knowingly makes any false statement or willfully and knowingly orders or authorizes the making of a false statement in the statement required under W.S. 39-14-107(a)(ii), 39-14-107(a)(i)(A), 39-14-207(a)(i), 39-14-307(a)(i), 39-14-407(a)(i), 39-14-507(a)(i), 39-14-607(a)(i) and 39- 14-707(a)(i) . . . .

WYO. STAT. ANN. § 39-13-108(c)(i)(B)–(C).  All provisions within § 39-13-108(c)(i) are centered on enforcement.

Notably, *immediately prior* to the above "Offenses and Penalties" section, the Wyoming tax statutes lay out the "Interest" section, which contains § 39-13-108(b)(ii)—the provision that imposes the 18.00% rate, and which is at issue in this case.  The "Interest" section of the enforcement statute specifies: (i) when taxes must be paid; (ii) the date on which taxes become delinquent under the statute; and (ii) the rate at which interest and/or penalty accrues, unless the ad valorem tax is paid in full by December 31.  WYO. STAT. ANN. § 39-13-108(b).  Meanwhile, the "Offenses and Penalties" section of the statute identifies: (i) penalties for failure to file ad valorem reports and statements; (ii) fines for failure to file those statements knowingly; (ii) fines to the county treasurers for failure to comply with a separate section of the same statute, and (iii) fines to an officer who refuses to comply with any requirement of the enforcement statute "for which no other penalty is provided."  WYO. STAT. ANN. § 39-13-108(c).  Thus, the offenses and

penalties listed under § 39-13-108(b) are applicable to provisions within § 39-13-108 to ensure (as its title provides) the enforcement of ad valorem taxes, as specified in § 39-13-108(b).

Under § 39-13-108(b)(i), a taxpayer is required to make the first installment (the equivalent of 50.00%) of its ad valorem taxes on November 10. If a taxpayer fails to make its first installment on time, it may avoid the imposition of interest or penalty if the entire tax is paid on or before December 31. WYO. STAT. ANN. § 39-13-180(b)(i). Here, Vanguard did not make the first installment of its 2016 ad valorem taxes on November 10, 2016. (Case No. 18-03244; ECF No. 31 at 5). However, it could have avoided the imposition of "penalty or interest" if it had made full payment of its 2016 ad valorem taxes on December 31, 2016, which it did not. Therefore, Vanguard did not comply with the payment requirements under § 39-13-108(b)(i) when it failed to pay the full amount of its 2016 ad valorem taxes on or before December 31, 2016. (Case No. 18-03244; ECF No. 31 at 4–5).

If the 18.00% rate provided under § 39-13-108(b)(ii) is not a penalty, as the Counties argue, then § 39-13-108(c)(i)(A) applies. WYO. STAT. ANN. § 39-13-108(c)(i)(A) (imposing a fine when an officer neglects or refuses to comply "with any requirement of this act *for which no other penalty is provided*" (emphasis added)). Thus, even if the 18.00% rate provided under § 39-13-108(b)(ii) is interest as the Counties contend, Vanguard's officers were exposed to a fine on December 31, 2016, "not to exceed one thousand dollars ($1,000.00)" under § 39-13- 108(c)(i)(A) for Vanguard's failure to comply with § 39-13-108(b)(i). (Case No. 18-03244; ECF No. 31 at 4–5). The question then becomes whether the officers' exposure to penalties extends to Vanguard pursuant to Vanguard's indemnity obligations to its officers, or whether penalty exposure to Vanguard's officers alone is sufficient to make the January 2017 Payments antecedent debts within the meaning of § 547(a)(4).

As noted earlier, under § 547(a)(4), "a debt for tax is incurred on the day when such tax is last payable without penalty, including any extension." 5 COLLIER ON BANKRUPTCY ¶ 574.02[4] (Richard Levin & Henry J. Sommer eds. 16th ed.). "Congress provided little explanation for this provision, which limits the number of tax payments to a governmental entity that would be preferential." *Id.* (citing 124 Cong. Rec. H10089, 112–13, 95th Cong., 2nd Sess. (1978), reprinted in 1978 U.S.C.C.A.N. 6436, 6568)). "Consequently, if taxes are paid before a penalty is imposed, the tax debt is not antecedent and no preference exists." 5 COLLIER ON BANKRUPTCY ¶ 574.02[4] (Richard Levin & Henry J. Sommer eds. 16th ed.).

Section 547(a)(4) "is not intended as a universal statement of when taxes 'become payable'" rather it "delineates which prepetition transfer may be recovered by the bankruptcy trustee." *In re Ripley,* 926 F.2d 440, 447–48 (5th Cir. 1991). "Because the trustee may avoid only those payments that are on account of an antecedent debt, the date on which the debt is incurred is critical." *Id.* Thus, § 547(a)(4) is intended to provide the date on which the debt was incurred within the Code. In other words, it provides courts with guidance to determine which payments may be avoided and returned to the bankruptcy estate. There is no question that the debt is owed; it is whether this specific debt is such that it may be avoided and recovered. Importantly, § 547(a)(4) does not specify against whom the penalty must be assessed. Rather, the only requirement under § 547(a)(4) is that the penalty relate to the tax owed, which is payable before *a* penalty (any penalty) is imposed.

Even without language in § 547(a)(4) requiring the imposition of a penalty against a debtor specifically, Vanguard alleges that § 39-13-108(c)(i)(A) applies directly to it, and thus exposes Vanguard directly to penalties through its indemnity obligations to its officers. (Case No. 18-

03244; ECF No. 31 at 11).[16]  As noted above, Vanguard cites the Confirmation Order, as support for its argument, which provides that "[t]he Debtors' directors, officers, and managers… (c) are entitled to indemnification from the Debtors under state law, organizational documents, and agreements."  (Case No. 17-30560; ECF Nos. 1109 at 15; *see* 2332 at 118 ("The Debtor[] obviously owes indemnification obligations to its officers and this makes the penalty effectively a penalty on the Debtor itself.")).  The Counties do not address, and thus appear to concede, whether the indemnification agreements between Vanguard and its officers apply such that Vanguard was exposed to a $1,000.00 fine pursuant to § 39-13-108(c)(i)(A) by virtue of those agreements.

"A contract of indemnity is one in which the promisor engages to pay the debt of another or to reimburse the other if the other is compelled to pay."  14 TEX. JUR. 3d *Contribution*, Etc. § 11 (Supp. 2019).  "The Business Organizations Code provides that a corporation must indemnify a governing person, former governing person, or delegate against reasonable expenses actually incurred by the person in connection with a proceeding in which the person is a respondent . . . ."  15 TEX. JUR. 3d *Corporations* § 359 (Supp. 2019) (citing TEX. BUS. ORGS. CODE ANN. § 8.051(a)).  Furthermore, "an enterprise may indemnify and advance expenses to a person who is not a governing person, including an *officer*, employee, agent, or delegate as provided by: (1) *the enterprise's governing documents*; (2) general or specific action of the enterprise's governing authority; (3) resolution of the enterprise's owners or members; (4) *contract*; or (5) common law."  15 TEX. JUR. 3d *Corporations* § 361 (Supp. 2019 (citing TEX. BUS. ORGS. CODE ANN. § 8.051(a)))  (emphasis added).  Notably, an "enterprise must indemnify an officer to the same extent that

---

[16] Vanguard notes "that the imposition of penalties upon its officers is precisely one of the consequences that [it] sought to avoid by filing" the Taxes Order motion. (Case No. 18-03244; ECF No. 31 at 11; Case No. 17-30560; ECF No. 8 at 10 ("Vanguard believes that any failure to pay the Taxes and Fees could materially disrupt Vanguard's business operations in several ways: . . . (c) certain of Vanguard's directors and officers could be subject to claims of personal liability, which would likely distract those key employees from their duties related to Vanguard's restructuring.")).

indemnification is required for a governing person." *Id*.  Thus, an officer is entitled to indemnification from a corporation by virtue of agreements between the two.

Furthermore, Vanguard cites *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002) for the proposition that an indemnity relationship creates a responsibility between a corporation and its officers such that any penalty provided against its officers is a penalty against Vanguard, which would then make the January 2017 Payments antecedent debts under § 547(a)(4).  The situation at issue before the Sixth circuit in *Dow Corning* is unlike the situation at issue before the Court. However, its recognition of indemnity relationships between a corporation and its officers is instructive.

In *Dow Corning*, the Sixth Circuit addressed the issue of whether "under certain circumstances a bankruptcy court may enjoin a non-consenting creditor's claim against a non-debtor to facilitate a Chapter 11 plan of reorganization." *Id*. at 653.  Although the Sixth Circuit found that the situation at issue before it did not allow for an injunction against a non-consenting creditor's claim, it answered the question in the affirmative—in certain, "unusual circumstances," a bankruptcy court can enjoin a non-consenting creditor's claim against a non- debtor.  *Id*. at 658. The "unusual circumstances" that would allow for such an injunction were based on a certain set of factors, the first of which is where: "[t]here is an identity of interest between the debtor and the third party, usually an *indemnity relationship*, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate." *Id*. (emphasis added).  Thus, the Sixth Circuit recognized that an indemnity relationship between a debtor and a third party (in that case, a non-debtor entity) created liability not solely to the third party, but by virtue of their indemnity relationship, to the debtor itself.  *Id*; *see In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 934–35 (Bankr. W.D. Miss. 1994) (citing the five factors); *In re Midway Gold U.S., Inc.,* 575

B.R. 475, 503–05 (Bankr. D. Col. 2017) (noting the same test was adopted in the First, Second, Fourth, Sixth, and Eleventh Circuits).

In light of the fact that there exists an indemnity relationship between Vanguard and its officers, imposition of a penalty or (in this case) exposure to penalty under § 39-13-108(c)(i)(A) as to Vanguard's officers would require Vanguard to indemnify or otherwise assume responsibility for a penalty assessed, if one were assessed, against its officers.  Therefore, a penalty against Vanguard's officers is in essence a penalty against Vanguard.  *In re Dow Corning Corp.*, 280 F.3d at 653.

As noted earlier, Vanguard neglected to comply with the payment requirements under § 39-13-108(b)(i) when it failed to pay the full amount of its 2016 ad valorem taxes on or before December 31, 2016.  (Case No. 18-03244; ECF No. 31 at 4–5).  Vanguard's failure to pay its 2016 ad valorem in taxes in full exposed its officers to penalties under § 39-13-108(c)(i)(A).  WYO. STAT. ANN. § 39-13-108(c)(i)(A) (imposing a fine when an officer neglects or refuses to comply "with any requirement of this act *for which no other penalty is provided*" (emphasis added)).  By virtue of its indemnity obligations to its officers, Vanguard is obliged to pay or reimburse its officers if such fine is or had been imposed.  *See* 14 TEX. JUR. 3d *Contribution*, Etc. § 11 (Supp. 2019).  Thus, Vanguard was exposed to a fine on December 31, 2016 "not to exceed one thousand dollars ($1,000.00)" under § 39-13-108(c)(i)(A) for its failure to comply with § 39- 13-108(b)(i). (Case No. 18-03244; ECF No. 31 at 4–5).  The January 2017 Payments (pursuant to 2016 ad valorem taxes owed) were incurred, or last payable without penalty on December 31, 2016.  Therefore, the January 2017 Payments are antecedent debts under § 547(b).

As noted above, the plain language of § 547 does not require that the exposure to penalty be a direct exposure to the debtor.  This highlights the importance of penalties under § 39-13-

108(c)(i)(A).  When Congress wrote § 547(a)(4), it provided that the potential for imposition of a penalty (any penalty) would render the taxes an antecedent debt.  Even without an indemnity relationship, the potential for the imposition of a penalty against Vanguard's officers suffices to make the January 2017 Payments antecedent debts.

Vanguard's officers and Vanguard (by virtue of Vanguard's indemnity obligations to its officers) were exposed to penalties under § 39-13-108(c)(i)(A), which made the January 2017 Payments antecedent debts under § 547(a)(4).  The antecedent debt element of § 547(b) is satisfied as a matter of law.  Accordingly, the Counties' requests for summary judgment on Vanguard's preference claims are Denied.

### Final Decree

The Counties argue, in the alternative, that they are entitled to summary judgment as to the January 2017 Payments because the claims are time-barred pursuant to 11 U.S.C. §§ 546(a) and 550(f).  (Case No. 18-03244; ECF No. 28 at 42).

On November 9, 2017, the Court entered the Final Decree, closing the cases of certain debtors, excluding VNR, pursuant to 11 U.S.C. § 350(a).  (*See* Case No. 18-03244; ECF No. 29 at 90–99). One of those debtors is Vanguard Operating, LLC, a subsidiary of VNR and the entity which made the payments at issue.  On January 22, 2019, Vanguard Operating filed an emergency motion, seeking to: (i) join VNR as a plaintiff in the Campbell, Johnson, and Sublette Counties' adversary proceedings pursuant to Rule 20(a)(1) of the Federal Rules of Civil Procedure, and (ii) leave to amend its Complaint under Rule 15(a)(2) of the Federal Rules of Civil Procedure.  (*See* Case No. 18-03244; ECF No. 23; Case No. 18-03246; ECF No. 36; Case No. 18-03247; ECF No. 22).  Vanguard Operating separately filed an emergency motion seeking to reopen its bankruptcy case pursuant to 11 U.S.C. § 305(a) and a motion to vacate the Final Decree under Federal

Bankruptcy Rule 9024.  (*See* Case No. 17-30561; ECF No. 12; Case No. 17-30560; ECF No. 2295).  The Counties opposed all relief, and now seek summary judgment on the basis that Vanguard cannot undo the effects of the Final Decree, which curtail Vanguard's chapter 5 causes of action.

Specifically, Campbell County asserts that: (i) the Final Decree did not override the limitation periods set forth in §§ 546(a)(2) and 550(f)(2); (ii) the Final Decree is not internally inconsistent; (iii) *Republic Supply Co. v. Shoaf* is distinguishable from the issue at hand; (iv) in the event that the Final Decree did override the Code's limitations, Vanguard failed to provide the Counties with adequate notice; (v) reopening the case would not revive Vanguard's chapter 5 causes of action; and (vi) the Final Decree may not be set aside through Rule 60(b) of the Federal Rules of Civil Procedure.  (Case No. 18-03246; ECF No. 40 at 36–54).

The Counties opposition asserts substantially the same arguments as that of Campbell County, adding that although the Final Decree may have provided the Reorganized Debtors[17] with "a collective standing as co-designees under" 11 U.S.C. § 1123(b)(3) "to bring claims on behalf on one another as representatives of one another" such estate representatives bring those claims "subject to all defenses and limitations that the claims would otherwise have been subject to," including those pursuant to §§ 546(a)(2) and 550(f)(2).  (Case No. 18-03244; ECF No. 29 at 112).  Thus, lack of substantive consolidation among the debtors precludes VNR from asserting chapter 5 causes of action in favor of Vanguard.  (Case No. 18-03244; ECF No. 28 at 46).

"Section 546(a) establishes a statute of limitations for avoidance of actions brought under sections 544, 545, 547, 548 and 553 of the Bankruptcy Code."  5 COLLIER ON BANKRUPTCY

---

[17] There are a total of thirteen Reorganized Debtors, which include Vanguard Operating, LLC.  (Case No 17-30561; ECF No. 9 at 1–3).

¶ 546.02[1][a] (Richard Levin & Henry J. Sommer eds., 16th ed.).  Under § 544(a), a chapter 5

cause of action may not be commenced after the earlier of:

> (1)    the later of—
>
> > (A)    2 years after the entry of the order for relief; or
> >
> > (B)    1 year after the appointment or election of the first trustee . . .
>
> *(2)    the time a case is closed or dismissed.*

11 U.S.C. § 546(a) (emphasis added).  Similarly, § 550, liability of transferee of avoided transfer,

provides, in relevant part:

> (a)    [t]o the extent that a transfer is avoided under . . . 547 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property . . .
>
> (f)    An action or proceeding under this section may not be commenced after the earlier of:
>
> > (1)    one year after the avoidance of the transfer on account of which recovery under this section is sought; or
> >
> > *(2)    the time the case is closed or dismissed.*

11 U.S.C § 550(a), (f) (emphasis added).  The Counties assert both provisions as defenses to

Vanguard's recovery of the January 2017 Payments.

      As provided above, Vanguard file a motion to reopen Vanguard Operating's bankruptcy

case pursuant to 11 U.S.C. §§ 105 and 350(b), and in the alternative, a motion to vacate the Final

Decree under Rule 60(b) of the Federal Rules of Civil Procedure.  (Case No. 17-30561; ECF No.

12; Case No. 17-30560; ECF No. 2295).

      Under the Bankruptcy Code, "[a]fter an estate is fully administered and the court has

discharged the trustee, the court shall close the case."  11 U.S.C. § 350(a).  A party, however, may

seek to reopen a case under § 350(b) "to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). "There is no question that Congress, in enacting § 350, intended it to be the means by which a case, once closed, could be reopened for future administration. It is, for the most part, ministerial." *In re Feringa*, 376 B.R. 614, 622 (Bankr. W.D. Mich. 2007). Courts have noted that:

> A motion to reopen is simply a mechanical device which can be brought ex parte and without notice. It has no independent legal significance and determines nothing with respect to the merits of the case.

*Id*. (citing *In re Abbott,* 183 B.R. 198, 200 (9th Cir. 1995)). "However, Congress in enacting § 546(a)(2), also established that—what is otherwise to be a liberal policy for reopening cases— must be tempered to accommodate the competing need for certainty required by persons who might be the targets of stale avoidance actions by the estate." *In re Feringa*, 376 B.R. at 622.

Accordingly, "if a case is closed and then reopened under section 350(b) of the Bankruptcy Code, it is not clear from section 546(a) whether the close of the case will operate to bar avoidance actions brought within the section 546(a)(1) time periods." 5 COLLIER ON BANKRUPTCY ¶ 546.02[2][b] (Richard Levin & Henry J. Sommer eds., 16th ed.); *see In re Feringa*, 376 B.R. at 622 ("Consequently, while § 350 permits a case to be reopened for virtually any good reason, the trustee is nevertheless barred by § 546(a)(2) from commencing any avoidance action in the reopened case."); *In re Bloxsom*, 389 B.R. 52, 60 (Bankr. W.D. Mich. 2008) ("While § 350 is quite clear that a closed case must be reopened by court order before further activity may take place, the entry of such an order would still leave unaltered the prior order entered under § 350(a) that had caused the case to be closed in the first place."). "In light of this ambiguity, courts have interpreted the word 'closed' in section 546(a)(2) to mean 'properly and finally' closed." *Id*. "A case is not properly or finally closed unless all assets, including avoidance actions, are administered." *Id*.

"However, because a case may always be reopened for cause, the 'properly and finally' closed standard is *questionable*." *Id.* (emphasis added). "Rather, commencement of an avoidance action after the closure of a case should be based on the rationale underlying the reopening of the case . . . ." *Id.*[18]

Generally, cases which have held that a case is not properly closed within the meaning of 11 U.S.C. § 350(a), have done so "based upon a theory that if assets were undisclosed there could never be a proper 'closing' of the case what would trigger the statutes of limitations to run." *In re Sandoval,* 470 B.R. 195, 201 (Bankr. D. N.M. 2012); *see In re Petty*, 93 B.R. 208, 212 (B.A.P. 9th Cir. 1988) ("[A] trustee should not be barred from bringing an avoidance action because the estate was closed under the mistaken assumption that it had been fully administered."); *White v. Boston*, 104 B.R. 951, 955 (Bankr. S.D. Ind. 1989) ("[I]t is clear that the closing of a case cannot trigger section 546(a)(2) unless the case has been *properly* closed, i.e., the assets fully administered."); *In re Peebles,* 224 B.R. 519, 520–21 (Bankr. D. Mass. 1998) ("[A] case is not properly or finally closed until the assets of the estate are fully administered, and the Debtor's failure to schedule the assets at issue in this proceeding resulted in their remaining unadministered upon the closing of the case."); *In re Serrato*, 214 B.R. 219, 226 (Bankr. N.D. Cal. 1997) ("The case has not been fully administered pursuant to § 350(b) and is not properly and finally closed where the court discovers a potential asset that the debtor has failed to disclose in a bankruptcy petition, which may be administered and may result in the return of money to the estate."). In each of these cases, the trustee sought reopening as a method to administer an asset previously undisclosed by the debtor.

---

[18] For example, "if the case is reopened for the purpose of avoiding a transfer that was not fully disclosed by a debtor prior to the date the bankruptcy case was closed, the original closure of the case itself should not bar the action under § 546(a)(2)." 5 COLLIER ON BANKRUPTCY ¶ 546.02[2][b] (Richard Levin & Henry J. Sommer eds., 16th ed.) (citing *In re Petty*, 93 B.R. 208, 212 (B.A.P. 9th Cir. 1988)).

The case before the Court presents a substantially different scenario—here, Vanguard, the debtor in these cases, knew the Reorganized Debtors were not fully administered within the meaning of § 350(a) when it sought to administratively close the cases.  The Final Decree was not intended to close Vanguard Operating's bankruptcy case within the meaning of § 350(a); rather, Vanguard sought to close the Reorganized Debtors' cases through the Final Decree in order to avoid the incurrence of U.S. Trustee's fees against the thirteen separate estates of the Reorganized Debtors.  (Case No. 18-03244; ECF No. 29 at 94 ("We insert some language in the Final Decree to make it clear that the parties [in] interest can continue to seek relief in the lead case even if it relates to the operating subsidiaries, whose case is already closed. Really the motivation here was just to cut off the meter on U.S. Trustee fees.")).

The Final Decree is a Court order.  The Court's intent, which granted the relief requested by Vanguard, is evidenced in the Final Decree, which states:

> *All contested matters or adversary proceedings that have been filed or that may be filed in the future shall be administered in the Lead Case*, notwithstanding the fact that such contested matters or adversary proceedings may be asserted on behalf of or against a Fully Administered Debtor. *Nothing in this Final Decree shall affect the substantive rights of any party in interest, including the Fully Administered Debtors*. The Court shall retain jurisdiction as is provided for in the Plan.
>
> The Chapter 11 case of the Remaining Debtor . . . shall remain open. The Remaining Debtor will file its Chapter 11 Post-Confirmation Quarterly Summary Reports with respect to the reporting periods from the Effective Date of the Plan until the entry of a final decree closing its chapter 11 case.
>
> *This Final Decree is intended to facilitate the administration of the chapter 11 cases of the Fully Administered Debtors only* and shall not have or be deemed to have any effect whatsoever upon the chapter 11 case of the Remaining Debtor or any order of this Court entered therein.

(Case No. 17-30561; ECF No. 9 at 4) (emphasis added).

The plain language in the first and third paragraphs of the Final Decree demonstrate the preservation of Vanguard's rights.  (Case No. 17-30561; ECF No. 9 at 4 ("Nothing in this Final Decree shall affect the substantive rights of any party in interest, including" the Reorganized Debtors)).  The Court intended to continue the administration of the estates of the Reorganized Debtors.  (*See* Case No. 18-03244; ECF No. 29 at 98 (finding that closure of the case was appropriate "even when there are pending matters that don't directly affect the reorganization of the Debtor").  Such intent is most evident in the first sentence of the Final Decree, which  instructs that all matters or adversary proceedings, both present and future, would be administered in the Lead Case "notwithstanding the fact that such contested matters or adversary proceedings may be asserted on behalf of or against a Fully Administered Debtor."  (Case No. 17-30561; ECF No. 9 at 4).  Thus, the Final Decree is clear—the Reorganized Debtor's estates would continue to be administered under the main bankruptcy case (VNR's case) upon the closing of the cases.

Vanguard's intent is evidenced by its statements throughout the November 9, 2017 hearing on the Final Decree.  (Case No. 18-03244; *see* ECF No. 29).  Specifically, Vanguard noted that it:

> [I]ncluded some language in a revised form of [the] final decree to make it clear [that] *the parties [in] interest can continue to seek relief in the lead case even if it relates to the operating subsidiaries*, whose case is already closed. Really the motivation here was just to cut off the meter on U.S. Trustee fees.

(Case No. 18-03244; ECF No. 29 at 94) (emphasis added).  Vanguard's purpose was unmistakable—it sought entry of the Final Decree to continue its administration of the Reorganized Debtors in a manner that would minimize its overall costs.

The Court highlighted its understanding of Vanguard's request and the Final Decree's procedural function through its inclusion of the last paragraph in the Final Decree, which retained jurisdiction over an ongoing dispute between Vanguard Operating and Retova Resources, L.P.

(Case No. 17-30561; ECF No. 9 at 5; *see* Case No. 17-30560; ECF No. 1505).  The Court sought to resolve any ambiguity that it would lose jurisdiction over the ongoing dispute.  (Case No. 18-03244; ECF No. 29 at 94 ("[T]o avoid any ambiguity about anything, we're retaining jurisdiction over [] Retova and the Retova dispute. And that nothing about . . . closing the administration of the other cases affects our continuing exercise of jurisdiction or their rights [on] appeal . . . .").  Notably, the Court highlighted its understanding that the Reorganized Debtors were not fully administered when it stated: "I do think it's appropriate to close the case at this stage *even where there are pending matters that don't directly affect the reorganization of the Debtor*."  (Case No. 18-03244; ECF No. 29 at 98) (emphasis added).

Thus, at the time the Final Decree was entered, both Vanguard and the Court believed that entering the Order was a "purely [] administrative and non-jurisdictional act," which intention and purpose is clear from the plain language of the Final Decree.  (Case No. 18-03244; ECF No. 29 at 95).  Vanguard's rights were preserved by virtue of the first paragraph in the Final Decree, which states: "Nothing in this Final Decree shall affect the substantive rights of any party in interest, including the Fully Administered Debtors."  (Case No. 17-30561; ECF No. 9 at 4).  Foreclosing Vanguard's ability to assert chapter 5 causes of action against the Counties would affect the substantive rights of a Reorganized Debtor, in this case Vanguard Operating, and cuts against the language of the Court's Order. The Final Decree operated to procedurally close the Reorganized Debtors' cases for the purpose of reducing Trustee's fees; however, the Order preserved Vanguard's right to assert chapter 5 causes of action against the Counties.  (Case No. 17-30561; ECF No. 9 at 4).

Although this situation is not like those where courts have found a case was never closed within the meaning of § 350(a), its effect is similar.  *See In re Petty*, 93 B.R. at 212 (allowing

trustee avoidance action where estate was closed "under the mistaken assumption that it had been fully administered"); *In re Peebles,* 224 B.R. at 520–21 (finding case not fully administered where debtor failed to schedule assets); *In re Serrato*, 214 B.R. at 226 (holding case was not properly and finally closed where debtor failed to disclose a potential asset); *In re Cortez*, 255 B.R. at 327 (citing cases "where the failure to discover or administer assets prior to original case['s] closure was the result of ambiguity or nondisclosure in debtors' schedules").  Here, Vanguard, the debtor, fully aware that it would seek further (and continuing) administration of the Reorganized Debtors' estates, sought to close the Reorganized Debtors' cases in exchange for not incurring fees—a purely procedural step.  The Court, fully aware of the Final Decree's procedural nature, entered an Order which effectively closed the Reorganized Debtors' cases, but *solely* for the purpose of curtailing the incurrence of U.S. Trustee's fees.  The Final Decree explicitly set forth that although the Reorganized Debtors' cases were closed, all current or future contested matters or adversary proceedings would be administered in the Lead Case.  Thus, the Final Decree overrode the limitation periods in §§ 546(a) and 550(f).

The Court recognizes the force of the Counties' arguments that the Court may have erred in taking this step.  Indeed, it may have been appropriate for the United States Trustee (who had notice of the motion and is the only party adversely affected by it) to object, but that did not occur. Even assuming *arguendo* that the Final Decree was entered in violation of the Bankruptcy Code, the Order remains enforceable and binding.  A determination that the Final Decree does not comport with the Code, would not invalidate its effect.  The Final Decree will be enforced as written in accordance with Supreme Court precedent.  In *United Student Aid Funds, Inc. v. Espinosa*, the Supreme Court upheld a student's discharge even where such discharge "was inconsistent with the Code and the Bankruptcy Rules." 559 U.S. 260, 260 (2010).  In *Espinosa*,

the student debtor filed a plan that proposed to discharge a portion of his student loan debt but failed to initiate an adversary proceeding as required for such a discharge. *Id*. at 264. The creditor did not object to the plan's proposed discharge. *Id*. at 265. Thereafter, the bankruptcy court confirmed the student's plan without holding an adversary proceeding as required by the Federal Rules of Bankruptcy Procedure or making a finding of undue hardship as required under the Bankruptcy Code pursuant to 11 U.S.C. § 523(a)(8). *Id*. at 263. The creditor appealed the bankruptcy court's decision. The Supreme Court conceded that "the Bankruptcy Court's failure to find undue hardship before confirming Espinosa's plan was legal error" but held that the order remained enforceable and binding on the creditor because the creditor had notice of the error and failed to object or timely appeal. *Id*. at 275.

Here, the language in the Final Decree and the statements made at the November 9, 2017 Hearing demonstrate that the Court intended the Order to carry nothing other than a procedural effect. Moreover, Vanguard sought entry of the Final Decree for the sole purpose of reducing its expenses by cutting off the incurrence of U.S. Trustee's fees. The Court honored that request by entering a Final Decree that did *solely* that—it closed the Reorganized Debtors' cases for the administrative purpose of stopping the incurrence of U.S. Trustee's fees in thirteen cases. The Court made it clear that claims for and against the Reorganized Debtors would continue to be administered in the main bankruptcy case in spite of the closing of the Reorganized Debtors' cases. (Case No. 17-30561; ECF No. 9 at 4 ("Nothing in this Final Decree shall affect the substantive rights of any party in interest, including the Fully Administered Debtors.")). Thus, the Final Decree superseded the limitation periods in §§ 546(a) and 550(f). Although this may (or may not) have been legal error on the part of the Court, the unappealed final order is binding. *Espinosa*, 559 U.S. at 275.

The Counties argue that even assuming "that the Debtors subjectively intended for the Final Decree to override [the] §§ 546(a) and 550(f) time bars, the Final Decree still cannot foreclose those defenses because the [Counties] were never given prior adequate notice that the at 41]. Assuming that the Counties were denied constitutionally adequate notice, relief to the Counties is not foreclosed by this Order. Of course, if the Counties seek to vacate the Order because they received inadequate notice, the remedy would be to vacate the entirety of the Order. The cases would not be closed. The Counties may file a motion seeking to vacate the Final Decree pursuant to Federal Rule of Bankruptcy Procedure 9024 in order to assert their constitutional claim. *See* 5 COLLIER ON BANKRUPTCY ¶ 546.02[2][b] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("[I]f an order closing a case is mistakenly granted and subsequently vacated pursuant to Federal Rule of Bankruptcy Procedure 9024, the case was never 'closed' for purposes of section 546(a)(2)."). Under Rule 60(b) of the Federal Rules of Civil Procedure, made applicable in bankruptcy cases by Rule 9024 of the Federal Rules of Bankruptcy procedure, a "court may relieve a party … from a final judgment, order, or proceeding for the following reasons:"

(1)    mistake, inadvertence, surprise, or excusable neglect;

(2)    newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under rule 59(b);

(3)    fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4)    the judgment is void;

(5)    the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)    any other reason that justifies relief.

FED. R. CIV. P.  60(b).  As noted previously, Vanguard seeks alternative relief in the form of a motion to vacate the Final Decree pursuant to Federal Rule of Bankruptcy Procedure 9024.  The Court will examine Vanguard's Rule 9024 motion first before addressing the Counties' potential relief.

From Vanguard's perspective, the issue before the Court fits squarely within Rule 60(b)(1). However, reasons (1), (2), and (3) are restricted in time, and may only be brought within one year of the entry of the judgment or order.  FED. R. CIV. P. 60(c)(1).  Accordingly, Vanguard may not avail itself of relief under Rule 60(b)(1).

Vanguard argues that it is entitled to relief under Rule 60(b)(4). (Case No. 17-30560; ECF No. 2295 at 7).  Specifically, Vanguard maintains that the "Final Decree should be enforced as written;" however, if the Order has resulted "from an egregious jurisdictional error, or violated fundamental due process rights," then it should be vacated under Rule 60(b)(4) as void.  (Case No. 17-30560; ECF No. 2295 at 7).  "A judgment is not void . . . simply because it is or may have been erroneous."  *Espinosa*, 559 U.S. 260, 270 (citations omitted).  "A void judgment is one so affected by a fundamental infirmity that the infirmity may be raised even when after the judgment becomes final."  *Matter of Nova*, 690 F. App'x 223, 225 (5th Cir. 2017) (internal quotations omitted).  Thus, "Rule 60(b)(4) allows a party to seek relief from a final judgment that is void, but only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard."[19]  *Espinosa*, 559 U.S. at 261 (internal quotations omitted).

"Federal courts considering Rule 60(b)(4) motions that assert a judgment is void because of a jurisdictional defect generally have reserved relief only for the exceptional case in which the

---

[19] As set forth below, the Counties may have been deprived of the right to be heard. Vanguard may not benefit from its own failure to provide notice to the Counties.

court that rendered judgment lacked even an 'arguable basis' for jurisdiction." *Id*. at 270. That is not the case here. The Court was within its jurisdiction to enter the Final Decree to close the Reorganized Debtors' cases. Thus, the Court must turn to whether there has been a violation of due process in entering the Final Decree.

Vanguard claims that voiding the judgment "would honor the animating principle of Rule 60(b)(4): to allow for the full and fair litigation of claims—not their dismissal." (Case No. 17-30560; ECF No. 2295 at 8 (citations omitted)). Vanguard cites *Seven Elves v. Eskenazi*, 635 F.2d 396, 403 (5th Cir. 1981) for the proposition that "Rule 60(b)(4) should be liberally construed in favor of a trial on the full merits of the case." (Case No. 17-30560; ECF No. 2295 at 8). However, the Fifth Circuit in *Eskenazi* in allowing relief, noted that the judgment at issue bore "many characteristics of a default judgment." *Id*. Thus, it held that the principle of finality of judgments should yield to the equities of the case so that "the appellants may be afforded their day in court." *Id*. Vanguard was not denied notice or opportunity to be heard with respect to the Final Decree. Rather, on November 9, 2017, the Court held a hearing on the Final Decree at which Vanguard had the opportunity to fully and fairly present their motion. (Case No. 18- 03244; ECF No. 29 at 93 ("The objective of the motion was simply to close the operating subsidiary cases. All of them are reorganized debtors.")). Accordingly, Vanguard may not avail itself of relief pursuant to Rule 60(b)(4).

The only other provision applicable to the situation at hand is Rule 60(b)(6). Rule 60(b)(6) is generally thought of as a "catch-all" phrase and is reserved for "extraordinary circumstances." *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005). "Rule 60(b)(6) grants federal courts broad authority to relieve a party from a final judgment upon such terms as are just, provided that the motion is made within a reasonable time." *Liljeberg v. Health Services Acquisition Corp.*, 486

U.S. 847, 863 (1988).  "The Rule does not particularize the factors that justify relief, but" the Supreme Court has "previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances' . . . ."  *Id*. at 865–64 (citations omitted); *see Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd.  P'ship*, 507 U.S. 380, 393 (1993) ("To justify relief under subsection (6), a party must show 'extraordinary circumstances' suggesting that the party is faultless in the delay.").  However, a Rule 60(b)(6) motion may not be "premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)."  *Liljeberg*, 486 U.S. at 865; *see Pioneer*, 507 U.S. at 393 ("These provisions are mutually exclusive, and thus a party who failed to take timely action due to 'excusable neglect' may not seek relief more than a year after the judgment by resorting to subjection (6).").

Although Vanguard has sought relief under Rule 60(b)(4), its mistake or inadvertence in seeking to close the cases of the Reorganized Debtors through the Final Decree fits much more squarely within the relief provided by Rule 60(b)(1).  In light of the fact that Vanguard did not seek relief pursuant to Rule 60(b)(1) within the one-year period required by Rule 60(c)(1), it may not now avail itself of relief under Rule 6(b)(6).  Accordingly, Vanguard's motion to vacate the Final Decree is denied. The Final Decree remains binding and enforceable on all parties.

The Counties assert that the Final Decree may not be enforced because the Counties were denied constitutional procedural due process.   (Case No. 18-03246; ECF No. 40 at 41). Specifically, the Counties claim that the Final Decree failed to provide them with constitutionally adequate notice that it purported to override the limitations under §§ 546(a) and 550(f).  In light of the Counties' claims, the Court grants the Counties 30 days to move to vacate the Final Decree

pursuant to Federal Rule of Bankruptcy Procedure 9024.  If the Counties move to vacate the Order, and its motion is granted, the Final Decree will be rendered void *in toto*.

Accordingly, a summary judgment determination as to the January 2017 Payments is abated for 30 days to give the Counties an opportunity to move to vacate the Final Decree.  This holding does not affect the other two payments at issue. (*See* Case No. 17-30560; ECF No. 2317 at 6 ("The 'improper plan distribution' and unjust enrichment claims asserted against certain of the Counties are not subject to the statute of limitations contained in § 546(a)(2).")).

### *Campbell County's Counterclaims*[20]

Campbell County asserts that even if the January 2017 Payment is avoided, recovery of the payment would not benefit the estate—if one existed despite the closing of Vanguard Operating's case. (Case No. 18-03246; ECF No. 40 at 53).  This is so because "any such recovery would result in the revival of a priority tax claim "for the first half of the Fiscal 2017 Taxes, with interest" pursuant to 11 U.S.C. § 502(h). (Case No. 18-03246; ECF Nos. 11 at 18; 40 at 53).  "Thus, litigating to achieve a recovery would be, at best, a wasteful and circular exercise; it could not produce any 'benefit . . . [to] the estate' and therefore would not be a proper undertaking under the Bankruptcy Code."  (ECF No. 18-03246; ECF No. 40 at 54 (citing 11 U.S.C. § 550(a)).

Vanguard responds that even if a priority claim arises on account of the January 2017 Payment as to Campbell County, the Reorganized Debtors would have no liability as to any claims under § 502(h), because the confirmation of the plan discharged Vanguard from any debt that arose before confirmation and specifically of "any debt of [the] kind specified in" § 502(h).  (ECF No. 18-03244; ECF No. 31 at 22).  Thus, Campbell County's counterclaim is foreclosed pursuant to 11 U.S.C. § 1141(b) and (c).  Campbell County counters that even if its "revived claim would be

---

[20] It does not appear as though Johnson or Sublette Counties have asserted counterclaims as to the January 2017 Payments.

discharged under 11 U.S.C. § 1141(c)," it would not mean anything in terms of "the revived claim's allowance and treatment under the Plan."  (Case No. 18-03246; ECF No. 40 at 54).  Thus, its claim should be allowed under the Plan.

Section 502(h) "is intended to put a creditor in the same position as it would have been if a recovered transfer had not occurred, permitting the creditor to assert a claim for the amounts owed just as it would if a preferential or other avoidable transfer had not been made."  4 COLLIER ON BANKRUPTCY ¶ 502.09[1] (Richard Levin & Henry J. Sommer, eds. 16th ed.).  "To the extent a defendant in an avoidance action becomes a claimant by reason of the return of property to the estate, the claim, if allowable, has the status of a claim existing at the date of the filing of the petition," including "all other rights that the creditor would have had against the estate in the absence of the avoided transfer."  *Id.* ¶ 502.09[2] (citing *In re Terry*, 443 B.R. 816 (B.A.P. 8th Cir.), *rev'd on other grounds*, 687 F.3d 961 (8th Cir. 2012)).  "Thus, a creditor that returns a preferential payment under section 547 will generally receive a dollar-for- dollar claim for the amount repaid to the estate, placing the creditor in the same position as if the transfer had not occurred."  4 COLLIER ON BANKRUPTCY ¶ 502.09[2] (Richard Levin & Henry J. Sommer, eds. 16th ed.).  However, as here, where the debtor's plan has been confirmed, such relief is unavailing.

Section 1141(b) provides that, "except as otherwise provided in the plan or the confirmation order," 'the confirmation of a plan vests all of the property of the estate in the debtor.'"  8 COLLIER ON BANKRUPTCY ¶ 1141.03 (Richard Levin & Henry J. Sommer, eds. 16th ed.).  Meanwhile, under § 1141(c) "property dealt with by the plan or the confirmation order is free and clear of all claims and interests of creditors, equity security holders and general partners

in the debtor." *Id.* ¶ 1141.04.[21]  Furthermore, the Bankruptcy Code provides that "[e]xcept as otherwise provided for in the plan or in the order confirming the plan, the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation . . . ." 11 U.S.C. § 1141(d)(1)(A); *see* 8 COLLIER ON BANKRUPTCY ¶ 1141.05[1][a] (Richard Levin & Henry J. Sommer, eds. 16th ed.) (noting that subject to certain exceptions, "a chapter 11 discharge of a debtor that is not an individual, discharges the debtor from any debt that arose before the date of confirmation of the plan and terminates all equity interest in the debtor that are provided for by the plan").  "The discharge is thus pervasive"—a claim is discharged under § 1141(d)(1)(A) "whether or not a proof of claim is filed, the claim is allowed, or the holder of the claim has accepted the plan."  8 COLLIER ON BANKRUPTCY ¶ 1141.05[1][a] (Richard Levin & Henry J. Sommer, eds. 16th ed.).

In September 2016, Campbell, Johnson, and Sublette Counties sent Vanguard invoices for its 2016 ad valorem taxes.  (Case No. 18-03246; ECF No. 40 at 6).  Vanguard did not pay any of the 2016 ad valorem tax prior to December 31, 2016.  (Case No. 18-03244; ECF No. 31 at 4– 5).  Instead, Vanguard paid the first installment of its 2016 taxes to Campbell, Johnson, and Sublette Counties on January 31, 2017, immediately prior to the filing of its bankruptcy petition.  (Case No. 18-03244; ECF No. 31 at 5; Case No. 18-03246; ECF No. 40 at 6).  Thus, Campbell County did not file a proof of claim as to the January 2017 Payment.  Thereafter, Vanguard filed chapter 11 bankruptcy on February 1, 2017.  (Case No. 17-30560; ECF No. 1).  Vanguard's chapter 11 reorganization plan was confirmed on July 18, 2017 and went effective August 1, 2017.  (Case No. 17-30560; ECF Nos. 1109, 1219).

---

[21] "Section 1141(c) is the 'default rule'—'unless the plan of reorganization, or the order confirming the plan, says that a lien is preserved, it is extinguished by the confirmation.'" 8 COLLIER ON BANKRUPTCY ¶ 1141.03 (Richard Levin & Henry J. Sommer, eds. 16th ed.) (citation omitted).

Vanguard's Confirmation Order explicitly provides for the discharge of claims such as the one asserted by Campbell County:

> Except as otherwise provided in the Plan or this confirmation Order, (a) on the Effective Date, *all such Claims against or Equity Interests in, the Debtors shall be satisfied, discharged, and released in full*, and (c) all persons shall be precluded from asserting against the Debtors, the Reorganized Debtors, or any of their successors or their assets or property any other or further Claims or Equity Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date. Except as provided in the Plan or this Confirmation Order, *Confirmation of the Plan will, as of the Effective Date, discharge the Debtors, pursuant to section 1141 of the Bankruptcy Code, from all Claims or other debts that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not a proof of claim based on such debt is filed or deemed filed pursuant to 501 of the Bankruptcy Code, a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code*, or the holder of a Claim based on such debt has accepted the Plan and satisfy or terminate all Equity Interests and other rights of equity security holder in the Debtors.

(Case No. 17-30560; ECF No. 1109 at 49–50) (emphasis added).   Pursuant to Vanguard's Confirmation Order, even if allowed under § 502(h), Campbell County's claim is discharged. (Case No. 17-30560; ECF No. 1109 at 50); *see* 11 U.S.C. § 1141(d)(1)(A).   Therefore, even if Campbell County's claim as to the January 2017 Payment is "revived" and allowed under the Plan pursuant to § 502(h), Vanguard's liability as to the claim was extinguished upon plan confirmation. (Case No. 17-30560; ECF No. 1109 at 50).   Although Vanguard could pay a discharged claim, it no longer is required to pay on Campbell County's potentially revived claim. Campbell County's counterclaim is futile where, as here, the debtor has received a discharge, and such discharge explicitly includes the type of claim it now seeks.

## II.    The May 2017 Payment—Claim 311

Count VII of Vanguard's Complaint seeks disallowance of Campbell County's claim. (Case No. 18-03246; ECF No. 1 at 10).   Campbell County filed a proof of claim based on

Vanguard's 2016 ad valorem taxes ("Claim 311").  On or about May 10, 2017, Vanguard made a payment to Campbell County with respect to Claim 311, representing the timely second installment of Vanguard's 2016 taxes.  (Case No. 18-03246; ECF No. 40 at 21).  Neither party disputes that Vanguard no longer has any liability as to Claim 311.  (Case No. 18-03246; ECF Nos. 1 at 10; 40 at 21).  Rather, Vanguard contends that Count VII is an objection to Claim 311 under Federal Rule of Bankruptcy Procedure 3007(b).  (Case No. 18-03244; ECF No. 31 at 27).  Vanguard seeks disallowance of Claim 311 on the basis that failure to disallow the claim would result in an impermissible double-recovery on a satisfied claim.  (Case No. 18-03244; ECF No. 31 at 27).  Campbell County counters that Claim 311 became an allowed claim when Vanguard failed to object to its proof of claim pursuant to 11 U.S.C. § 502(a) and has since then been satisfied and extinguished.  (Case No. 18-03246; ECF No. 40 at 55–56).  Thus, no claim remains for allowance or disallowance under 11 U.S.C. § 502(b).

A proof of claim filed under 11 U.S.C. § 501 constitutes *prima facie* evidence of the validity and amount of the claim.  FED. R. BANKR. P. 3001(f).  Furthermore, "[a] claim or interest, proof of which is filed under § 501 . . . is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  If a claim is objected to, "the court, after notice and hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of filing of the petition, and shall allow such claim in such amount," except to the extent that it is subject to one or more specified grounds for disallowance set forth in § 502(b), (d), or (e).  11 U.S.C. § 502(b).  Under § 502(b), the court will disallow a claim if "such claim is unenforceable against the debtor and property of the debtor under any agreement or applicable law . . ."  11 U.S.C. § 502(b)(1).  Accordingly, Vanguard may object to Campbell County's claim based on any legal theory challenging the validity or enforceability of the claim.

While Vanguard's objection to Campbell County's claim is raised as part of an adversary complaint, counts for relief that could establish grounds for disallowance are more akin to a defense than to a claim for affirmative relief.  In fact, Bankruptcy Rule 3007(b) requires that Vanguard file an adversary complaint to raise its pending objections to Campbell County's claim. Pursuant to Bankruptcy Rule 3007(b), "[a] party in interest shall not include a demand for relief of a kind specified in Rule 7001 in an objection to the avoidance of a claim, but may include the objection in an adversary proceeding."  FED. R. BANKR. P. 3007(b).  Bankruptcy Rule 7001 includes among the types of proceedings that must be brought by adversary complaint, "a proceeding to determine the validity, priority, or extent of a lien or other interest in property . . . ." FED. R. BANKR. P. 7001(2).

Rule 3007 sets no time period within which an objection must be made to the allowance of a claim.  4 COLLIER ON BANKRUPTCY ¶ 502.02[3][d] (Richard Levin & Henry J. Sommer eds., 16th ed.).  "A cutoff date would be inappropriate, for in many cases it may not be known until late in the administration of the case whether there will be any dividend and, consequently, whether a useful purpose would be served by a trustee making an objection."  *Id*.  Any distribution made on a claim that is subsequently disallowed may be recovered.  *Id*.

Here, Vanguard seeks disallowance on the basis that allowing Claim 311 would constitute an impermissible double-recovery on a satisfied claim.  (Case No. 18-03244; ECF No. 31 at 27). Campbell County, however, counters that there is no claim to disallow because payment has extinguished the claim.  (Case No. 18-03246; ECF No. 40 at 55–56).  Furthermore, Vanguard has not sought to avoid or recover the May 2017 Payments as to any of the Counties, including Campbell County.  (Case No. 18-03244; ECF No. 28 at 17; Case No. 18-03246; ECF No. 40 at 15).  Therefore, the Court need not determine the validity or enforceability of Claim 311 when

neither party disputes its validity or its satisfaction through the May 2017 Payment.  If there is a remaining ambiguity, the Court orders that no further payment on Claim 311 is required.

## III.        The November 2017 Payments (Counts I, III & IV)

Campbell, Carbon, Johnson, Natrona, Park, Sublette, and Sweetwater Counties seek summary judgment as to the November 2017 Payments on the basis that the payments (i) were voluntary pursuant to 11 U.S.C. § 524(f); or (ii) otherwise authorized under the Taxes Order.  (Case No. 18-03244; ECF No. 28).  Vanguard filed a cross motion for summary judgment on Counts I, III, and IV of its Complaint.  (*See* Case No. 18-03245; ECF No. 24).  Specifically, Vanguard alleges that: (i) the November 2017 Payments were improper distributions under the terms of the confirmed plan pursuant to § 105, which were not voluntary; (iii) reliance on the Tax Order is implausible; (iv) the Counties were unjustly enriched; and (v) the Counties cannot satisfy the excusable neglect standard on their counterclaims.[22]  (Case No. 18-03244; ECF No. 31; Case No. 18-03245; ECF No. 24).

The Counties' response largely tracks its own summary judgment motion, adding that: (i) Vanguard failed to meet the requirements necessary for unjust enrichment; (ii) excusable neglect is a fact-specific inquiry, which cannot be decided on summary judgment; and (iii) John Monroe's Declaration ("the Monroe Declaration"), which Vanguard uses to support its motion, should be disregarded based on Mr. Monroe's contradicted testimony.  (Case No. 18- 03245, ECF No. 26). In a separate response, which is substantially similar to the Counties' response, Campbell County invokes the doctrine of changed circumstances and the defense of laches. It argues that the November 2017 Payments may not be recovered because: (i) more than 80.00% belonged to

---

[22] As noted, Carbon, Natrona, Park, and Sweetwater Counties asserted counterclaims in their response to Vanguard's Complaints, seeking allowance of late filed proofs of claim pursuant Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure. (Case No. 18-03245; ECF No. 19 at 8–9). Campbell County also asserted a separate counterclaim seeking substantially the same relief. (Case No. 18-03246; ECF No. 11 at 19–20).

independent taxing authorities; (ii) in accordance with the "budget defense," the small percentage that belonged to Campbell County has been used for the public good; and (iii) Vanguard's own delay in seeking recovery of the funds "has prejudiced and disadvantaged the County." (Case No. 18-03246; ECF No. 24 at 15–21).

*Background Recap*

Vanguard filed chapter 11 bankruptcy on February 1, 2017. (Case No. 17-30560; ECF No. 1). On February 2, 2017, the Court entered the Taxes Order authorizing the payment of prepetition taxes. (Case No. 17-30560; ECF No. 59). Vanguard's chapter 11 reorganization plan was confirmed on July 18, 2017 and went effective on August 1, 2017. (Case No. 17-30560; ECF Nos. 1109, 1219). Between September and October 2017, six Wyoming Counties— Campbell, Carbon, Johnson, Natrona, Park, and Sweetwater—mailed tax assessments to Vanguard for its oil and gas produced in 2016 (for its 2017 ad valorem taxes). (Case No. 18- 03244; ECF No. 28 at 17; Case No. 18-03246; ECF No. 1 at 5). Vanguard made the first installment of its 2017 ad valorem taxes to the six Counties on November 10, 2017 in the following amounts:

| Date | County | Ad Valorem Taxes Paid |
|------------|--------------|----------------------:|
| 11/10/2017 | Campbell | $178,665.03 |
| 11/10/2017 | Carbon | $163,655.12 |
| 11/10/2017 | Johnson[23] | $178,665.03 |
| 11/10/2017 | Natrona | $330,058.54 |
| 11/10/2017 | Park | $879,873.80 |
| 11/10/2017 | Sweetwater | $332,144.79 |

(Case No. 18-03244; ECF No. 28 at 17; Case No. 18-03246; ECF No. 40 at 21).

---

[23] Johnson County did not file a counterclaim pursuant to Rule 9006(b). (*See* Case No. 18-03247).

### A.      *Counts I & III: Improper Plan Distributions & Disgorgement*

*Voluntary Payments pursuant to 11 U.S.C. § 524(f)*

Vanguard alleges that the November 2017 Payments were improper distributions under the Plan, for which the remedy is disgorgement.  (Case No. 18-03244; ECF No. 31 at 28–29).  The Counties argue that neither "improper plan distribution" nor "disgorgement" are cognizable causes of action.  (Case No. 18-03244; ECF No. 28 at 21).  Rather, the Counties contend that the November 2017 Payments are not recoverable because they are voluntary payments pursuant to 11 U.S.C. § 524(f), or alternatively that the November 2017 Payments were authorized under the Court's Taxes Order.  (Case No. 18-03244; ECF No. 28 at 23–27).[24]

The Bankruptcy Code provides that "[e]xcept as otherwise provided for in the plan or in the order confirming the plan, the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation . . . ."  11 U.S.C. § 1141(d)(1)(A).  As provided above, Vanguard concedes that the November 2017 Payments "accrued as of January 1, 2017, and" are therefore prepetition claims against Vanguard.  (ECF No. 18-03245; ECF No. 24 at 6).  Furthermore, the Counties acknowledge that they did not submit proofs of claims for the November 2017 Payments before July 31, 2017 (the "Government Bar Date").  (Case No. 18-03245; ECF No. 19 at 8–9 (asserting a counterclaim for an allowed claim in the amount equal to its November 2017 Payment pursuant to Rule 9006(b)(1)).  Therefore, at the time of the November 2017 Payments, the Counties did not have allowed proofs of claim.  However, the Counties contend that notwithstanding Vanguard's discharge, the November 2017 Payments are voluntary payments pursuant to § 524(f) and are therefore not recoverable.  (Case No. 18-03244; ECF No. 28 at 23–27).

---

[24] The Court has found no case law referring to an "improper plan distribution" cause of action. Rather, the Court will analyze Vanguard's argument as asserting a discharge violation by the Counties.

In general, § 524 protects a debtor from any subsequent action by a creditor whose claim has been discharged in a bankruptcy case. *In re Edgeworth*, 993 F.2d 51, 53 (5th Cir. 1993). To ensure that a discharge will be completely effective, § 542(a)(2) "provides for a broad injunction against not only legal proceedings but also any other acts to collect a discharged debt as a personal liability of the debtor, whether or not discharge of the debt has been waived." 4 COLLIER ON BANKRUPTCY ¶ 524.02[2][a] (Richard Levin & Henry J. Sommers eds., 16th ed.); *see In re Edgeworth*, 993 F.2d at 53 (noting § 542 "operates as an injunction against enforcement of a judgment or the commencement or continuation of an action in other courts to collect or recover a debt as a personal liability of the debtor"). "*Creditors* are obligated to maintain procedures to ensure that they do not violate section 524, and may be held liable for damages and attorney's fees if they do not do not."[25]  4 COLLIER ON BANKRUPTCY ¶ 524.02[2][b] (Richard Levin & Henry J. Sommers, 16th ed.) (emphasis added).

However, a "discharge in bankruptcy does not extinguish the debt itself, but merely releases the debtor from personal liability for the debt." *In re Edgeworth*, 993 F.2d at 53. Even though a debtor has no personal liability for a discharged debt, there is nothing in the Bankruptcy Code that prevents the debtor from voluntarily paying the debt under § 524(f). 4 COLLIER ON BANKRUPTCY ¶ 524.01 (Richard Levin & Henry J. Sommers eds., 16th ed.). Section 524 provides that notwithstanding the prohibition against the collection of discharged debts, a debtor may repay debts that would otherwise be dischargeable, either by entering into a formal reaffirmation agreement under § 524(c) and (d), or by making voluntary payments in the absence of such an agreement pursuant to § 524(f). Sections 524 (a) and (d) simply "render ineffective any agreement

---

[25] "Civil contempt is the normal sanction for violations of the discharge injunction." 4 COLLIER ON BANKRUPTCY ¶ 524.02[2][c] (Richard Levin & Henry J. Sommers eds., 16th ed.). However, here, Vanguard has not sought sanctions for the Counties' alleged violations. (Case No. 17-30560; ECF No. 2332 at 12).

to repay or legal action to collect all or any portion of a non-reaffirmed debt and prohibit affirmative acts to collect it."  4 COLLIER ON BANKRUPTCY ¶ 524.06 (Richard Levin & Henry J. Sommers eds., 16th ed.).  "[I]f payment is made as a result of pressure or coercion, it is not made voluntarily in the sense of section 524(f)."  *Id*.

To support their proposition that the November 2017 Payments are voluntary pursuant to § 524(f), the Counties cite *In re Hudson*, 168 B.R. 368 (Bankr. S.D. Ill. May 18, 1994).  (Case No. 18-03244; ECF No. 28 at 26).  In *Hudson*, the debtors continued to make payments to the bank after receiving a chapter 7 discharge under the assumption that they were still obligated on the debt.  *Id*. at 369.  The bank—without asking for payment or initiating contact with the debtors after their bankruptcy filing—accepted payment.  *Id*.  at 370.  In determining that the payments were voluntary within the meaning of § 524(f), the court highlighted that:

> "[V]oluntary" in § 524(f) is used in an objective sense as referring to repayment that is free from creditor influence or inducement *regardless* of whether the debtor was motivated by forces unrelated to the creditor. Under this reading of § 524(f), the Court need not satisfy itself that the debtor's action was wholly spontaneous nor need it monitor the debtor's psyche to ascertain what forces motivated the debtor's repayment. Rather, the Court will examine the appropriateness of the creditor's actions to determine if any violation of the preceding subsections protecting the debtor's discharge occurred.

*Id*. at 372 (emphasis added); *see In re Poindexter*, 376 B.R. 732, 737 (Bankr. W.D. Miss. Sept. 12, 2007) ("A debtor's repayment of a discharged debt will be considered 'voluntary' if it is free from creditor influence or inducement."); *Van Meter v. American State Bank*, 89 B.R. 32, 34 (W.D. Ark. Aug. 1, 1988) ("[T]he provisions of § 524(f) do not validate repayments of discharged debts that are in any manner induced by the acts of the creditor.").  Therefore, under *Hudson*, a court's focus should be the creditor's actions rather than a debtor's motivation for payment.  *Id; see generally* 4 COLLIER ON BANKRUPTCY ¶ 524.02[2][b] (Richard Levin & Henry J. Sommers eds., 16th ed.)

("Creditors are obligated to maintain procedures to ensure that they do not violate section 524, and may be held liable for damages and attorney's fees if they do not do not.").

Here, there was creditor action—the Counties mailed tax assessments to Vanguard for its 2017 ad valorem taxes between September and October 2017.  (Case No. 18-03244; ECF No. 28 at 17; Case No. 18-03246; ECF No. 1 at 5).  Vanguard paid the first installment of its 2017 ad valorem taxes on November 9, 2017, after it received the Counties' tax assessments. (Case No. 18-03244; ECF No. 28 at 17).  Thus, unlike in *Hudson*, where the bank made no contact with the debtors after their bankruptcy filing, it cannot be said that the November 2017 Payments were "free from creditor influence or inducement" because the Counties sought payment through the tax assessments.  *Hudson*, 168 B.R. at 370, 372; *see In re Poindexter*, 376 B.R. at 737 ("[A] debtor's payments on a discharged debt are to be regarded as voluntary where the creditor's only action is simply to accept the debtor's payments.").  However, there must still be a link between creditor action and debtor repayment.  *Van Meter*, 89 B.R. at 34 ("One kind of 'voluntary' repayment is one that is spontaneous, that is, uninduced by anything other than the actor's own conscience, or, perhaps, by some inducement provided by a third party, not the creditor.").

Vanguard claims one of the reasons it made the November 2017 Payments "was to avoid the imposition of the onerous interest penalty for late payments."  (Case No. 18-03244; ECF No. 31-2 at 4).  Thus, it argues that the tax assessments induced or influenced payment, negating voluntariness.  The Counties argue, highlighting a February 5, 2018 hearing in a separate case, that Vanguard would have made the November 2017 Payments regardless of the tax assessments. (Case No. 18-03245; ECF No. 26 at 12–14; Case No. 18-03246; ECF No. 42 at 8–11).

Specifically, Campbell County contends that Vanguard was prepared and intended to make the November 2017 Payments regardless of the Counties' actions, and that therefore, the tax

assessments did not influence Vanguard's actions.  (Case No. 18-03246; ECF No. 42 at 8–9 (quoting Mr. Monroe's testimony from a prior hearing)).

The Court will not weigh the evidence or make a credibility determination on summary judgment.  *Wheat*, 811 F.3d at 713; *E.E.O.C.*, 773 F.3d at 694.  Whether the November 2017 Payments were spontaneous or entirely motivated by factors outside of the Counties' actions is a genuine issue of material fact, which cannot be decided on summary judgment.  The Counties' actions, in mailing tax assessments to Vanguard prior to payment, preclude finding as a matter of law that the November 2017 Payments were "voluntary" within the meaning of § 524(f).

*Taxes Order*

In the alternative, the Counties argue that the "Court can conclude as a matter of law . . . that the November 2017 Payments were authorized under the Taxes Order and therefore were not improper.  (Case No. 18-03245; ECF No. 26 at 6).  Specifically, the Counties contend that they (as taxing authorities) "were expressly authorized to rely on [Vanguard] as to which payments were authorized by the Order."  (Case No. 18-03244; ECF No. 28 at 30).  Thus, based upon the language of the Taxes Order, the Counties were "permitted—indeed, *required*—to rely upon Debtors' voluntary remittance as a representation that the payment was property authorized . . . ."  (Case No. 18-03244; ECF No. 28 at 30).

On February 2, 2017, the Court entered the Taxes Order authorizing the payment of prepetition taxes.  (Case No. 17-30560; ECF No. 59).  The Taxes Order provided that:

> Vanguard is authorized, but not directed, to remit and pay (or use tax credits to offset) the Taxes and Fees that accrued prior to the Petition Date and that will become payable during the pendency of these chapter 11 cases, and remit and pay (or use tax credits to offset) Taxes and Fees that arise or accrue in the ordinary course of business on a postpetition basis, in each case, solely to the extent that such Taxes and Fees become payable in accordance with applicable law.

(Case No. 17-30560; ECF No. 59 at 1).  Vanguard concedes that its payment to the Counties "accrued as of January 1, 2017 and represents a prepetition claim against" Vanguard.  (ECF No. 18-03245; ECF No. 24 at 6).  However, Vanguard argues that the Court's authority as provided by the Taxes Order terminated upon confirmation of the plan.  (Case No. 18-03244; ECF No. 31 at 35 ("[U]pon confirmation, property of the estate vested in the Reorganized Debtors and the authorizations contained in the order became moot" and even if not moot, the Order was "superseded by the treatment of prepetition claims provided for in the Plan")).

Vanguard's chapter 11 reorganization plan was confirmed on July 18, 2017 and went effective on August 1, 2017.  (Case No. 17-30560; ECF Nos. 1109, 1219).  Vanguard made the first installment of its 2017 ad valorem taxes to the six Counties on November 10, 2017.  Therefore, the November 2017 Payments were made after plan confirmation.  Vanguard's confirmed plan provides:

> Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

(Case No. 17-30560; ECF No. 834 at 92).  Furthermore, the Code provides that "[e]xcept as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor."  11 U.S.C. § 1141(b).  Thus, while the Taxes Order authorized Vanguard to make payments of its prepetition debts between the time of its chapter 11 filing and the date of confirmation, at the time Vanguard made the November 2017 Payments to each of the five Counties, the Court's authority under the Taxes Order was no longer in effect.

As noted above, the Counties argue that they were required to rely upon Vanguard's "voluntary remittance as a representation that payment was properly authorized."  (Case No. 18-03244; ECF No. 28 at 30).  However, between September and October 2017—prior to the

November 2017 Payments—the Counties mailed Vanguard tax assessments for its oil and gas produced in 2016.  (Case No. 18-03244; ECF No. 28 at 17).  Therefore, the Counties affirmatively sought payment for Vanguard's 2016 taxes.  Whether the November 2017 Payments were "voluntary" within the meaning of § 547(f) is a contested issue of fact.

Finally, this same argument was foreclosed by the Court in a previous hearing with another county.  (*See* February 5, 2018 Hearing).  On February 5, 2018, the Court held a hearing on whether to allow Sublette County's proof of claim for Vanguard's 2017 ad valorem taxes.  (Case No. 17-30560; ECF No. 1751).  At the hearing, the Court noted that the Tax Order did not authorize the November 2017 Payment to Sublette County, but rather that the plan controlled at the time payment was made.  (Case No. 17-30560; ECF No. 1751 at 91 ("[T]he tax motion did not authorize the payment of [the November 2017 Payment].  The plan controlled; it took over the tax motion.")).

Accordingly, summary judgment as to Counts I & III is denied.

### B.      *Count IV: Unjust Enrichment*

Vanguard asserts that the Counties have been unjustly enriched by the alleged improper plan distributions and therefore it would be inequitable to allow the Counties to retain tax payments they were never entitled to receive.  (Case No. 18-03245; ECF No. 24 at 11).  The Counties counter that Vanguard's claim for unjust enrichment fails because Vanguard has failed to satisfy the necessary elements for an unjust enrichment claim.  (Case No. 18-03245; ECF No. 26 at 7).

"Under Wyoming law, unjust enrichment, or quantum meruit, is an equitable doctrine that "implies a contract so that one party may recover damages from another."  *Union Telephone Co. v. Qwest Corp.*, 495 F.3d 1187, 1197 (10th Cir. 2007).  To prevail on a claim of unjust enrichment, a plaintiff must prove that: "(1) valuable services were rendered; (2) to the party to be charged; (3) which services were accepted, used, and enjoyed by the party to be charged; and (4) that the

services were furnished under such circumstances as would reasonably notify the party to be charged that the plaintiff, in rendering such services, expected to be paid by the party to be charged." *Jacoby v. Jacoby*, 100 P.3d 852, 855 (Wyo. 2004). Under the fourth element, "not only must the proponent of the theory prove that the circumstances were such that the other party was reasonably notified that the proponent expected to be paid for services rendered or materials furnished, but the proponent must prove that without such payment, the party would be unjustly enriched." *Black Card, LLC v. Visa U.S.A., Inc.*, 766 F. App'x 583, 595 (10th Cir. 2019). "Unjust enrichment 'is an equitable remedy that is appropriate only when the party to be charged has received a benefit that in good conscience the party ought not to retain without compensation to the party providing the benefit.'" *Id.*; *see Burning Rock Energy LLC v. Pinnacle Gas Resources, Inc.*, 2007 WL 9706009, at *2 (D. Wyo. Mar. 6, 2007) ("The words 'unjust enrichment' concisely state the necessary elements of an equitable action to recover money, property, etc., which 'good conscience' demands should be set over to the appellee by appellants pursuant to an implied contract between them."). Unjust enrichment is meant to prevent a person from enriching himself at the expense of the other." *Id*.

Vanguard does not address the elements of unjust enrichment. (Case No. 18-03245; ECF No. 24 at 11). Rather, Vanguard argues succinctly that the Counties were on notice to file proofs of claim, which they did not. (Case No. 18-03245; ECF No. 24 at 11). Thus, Vanguard concludes that the Counties' failure to file proofs of claim resulted in a discharge, which makes the November 2017 Payments unjust. (Case No. 18-03245; ECF No. 24 at 11). The Counties counter that the discharge did not extinguish the debt itself, "but merely release[d] the debtor from personal liability for the debt." (Case No. 18-03245; ECF No. 26 at 7 (citing *In re Edgeworth*, 993 F.2d at

53)).  Thus, the Counties argue that November 2017 Payments were not "unjust" because they were in partial satisfaction of lawful debts.  (Case No. 18-03245; ECF No. 26 at 8).

Vanguard is correct in that "no proof of wrongdoing or wrongful intent" is necessary for a finding of unjust enrichment.  *Landeis v. Nelson*, 808 P.2d 216, 218 (Wyo. 1991).  However, "the showing of an enrichment will not in and of itself be sufficient. In order to invoke the remedial power of a court of equity, the underlying circumstances, as between the two parties, must be such that the enrichment is unjust."  *Id*.  The Counties claim that they accepted the November 2017 Payments under the belief that they were voluntary payments or otherwise authorized pursuant to the Taxes Order.  (Case No. 19-03244; ECF No. 28 at 23–27).  Vanguard has not demonstrated as a matter of law that the "property was wrongfully secured or passively received" because voluntariness of payment is a disputed issue of fact.  *Landeis*, 808 P.2d at 28.  Summarily stating that the Counties failed to file proofs of claim is not sufficient to support summary judgment.

Accordingly, summary judgment as to Vanguard's Count IV is denied.

## IV.     Counties' Counterclaim

Campbell, Carbon, Natrona, Park, and Sweetwater Counties asserted counterclaims in response to Vanguard's Complaint.  (See Case No. 18-03245; ECF No. 19; Case No. 18-03246; ECF No. 11 at 19–20).  The Counties' counterclaims seek allowance of late filed proofs of claim pursuant to Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure.  (Case No. 18-03245; ECF No. 19 at 8–9).[26]  Vanguard requests the Counties' motion be dismissed because they have failed to show excusable neglect under the Fifth Circuit's strict approach.  (Case No. 18-03245; ECF No. 24 at 12).  The Counties' respond that the counterclaim cannot be adjudicated on summary judgment in light of the fact that excusable neglect is a highly specific inquiry.

---

[26] Campbell County's counterclaim seeks "leave to file a priority claim for Fiscal 2018 Taxes on the ground of excusable neglect." (Case No. 18-03246; ECF No. 11 at 19–20).

Rule 9006(b)(1) authorizes a court to permit a late filing if the movant's failure to comply with an earlier deadline was the result of excusable neglect.  FED. R. BANKR. P. 9006(b)(1).  The Supreme Court has set forth certain factors to consider in making a determination involving excusable neglect.  These factors are: (1) the reason for the delay, including whether it was in the reasonable control of the movant; (2) whether the movant acted in good faith; (3) the danger of prejudice to the non-movant; and (4) the length of the delay and its potential impact on judicial proceedings.  *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. Partnership*, 507 U.S. 380, 395 (1993).  A determination of whether neglect is "excusable" warranting allowing of late filing of claim is at bottom an equitable one, taking account of all relevant circumstances surrounding the movant's omission.  *Id.* at 396.

The Counties seek allowance of their proofs of claim "[i]n the event the Plaintiff prevails on one or more of its claims such that the County is required to repay some or all of the Tax Payment."  (Case No. 18-03245; ECF 19 at 8).  In light of the fact that summary judgment as to Counts I, III, and IV is denied, a determination regarding the Counties' counterclaims is premature.

### Conclusion

After the expiration of the 30 days allowing the Counties to file a motion to vacate the Final Decree, the Court will issue an appropriate order.


SIGNED 01/21/2021


_____
Marvin Isgur
United States Bankruptcy Judge